PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 09-2619

———————

UNITED STATES OF AMERICA

v.

ANGELA LARKIN,
                              Appellant

———————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(No. 4:04-cr-0071-001)
The Honorable John E. Jones, III, District Judge

———————

Submitted Under Third Circuit LAR 34.1(a)
February 23, 2010

Before: SCIRICA and CHAGARES, <u>Circuit Judges</u>,
and RODRIGUEZ,[*] <u>District Judge</u>

(Opinion filed: December 10, 2010 )

Anne C. Shapiro, Esquire
Shapiro & Becker, P.C.
114 Market Street
Lewisburg, PA 17837
    <u>Attorney for Appellant</u>

Dennis C. Pfannenschmidt , Esquire
United States Attorney
Middle District of Pennsylvania

Frederick E. Martin, Esquire
Assistant United States Attorney
Herman T. Schneebeli Building
240 West Third Street, Suite 316
Williamsport, PA 17707-6465
    <u>Attorneys for Appellee</u>

_____

[*]The Honorable Joseph H. Rodriguez, Senior United States District Judge for the District of New Jersey, sitting by designation.

2

RODRIGUEZ, <u>Senior District Judge</u>

## I. INTRODUCTION

Pursuant to a plea agreement, appellant Angela Larkin[1] entered a plea of guilty to a violation of 18 U.S.C. § 2251(a) for producing child pornography. Larkin's criminal conduct involved, *inter alia*, the trading of photographs which contained visual depictions of her daughters, then ages two and five, over the internet to known pedophiles.[2] The District Court sentenced Larkin to the statutory maximum term of incarceration of three hundred sixty months, to be followed by a life term of supervised release. Larkin appeals her sentence arguing that: (1) the District Court erroneously concluded that visual depictions of B.L. rendered her a "second victim" meriting a two-level sentencing enhancement pursuant to U.S.S.G. § 2G2.1(c)(1)(2003); (2) the government violated the terms of the plea agreement; (3) the District Court's application of a five

---

[1]Larkin is also known as "Angela McCullen," "Martina McCullen," and "Angela J. Main." As a matter of convenience, we will refer to her as either "Larkin" or "Appellant."

[2]We will refer to the two year old daughter as "M.M." and the five year old daughter as "B.L."

level upward departure under U.S.S.G. § 5K2.0 violates the ex post facto clause; and (4) the sentence was unreasonable.

For the reasons we discuss below, we will affirm the final judgment of sentence of the District Court.

## II. BACKGROUND

The investigation that led to the arrest and prosecution of Angela Larkin began in Waco, Texas, where authorities discovered a sexually explicit video of a minor on the computer of Phillip Roberts. The video contained close up shots of the child's genitalia and pubic regions and was titled "Peanut," which is a nickname Larkin called M.M. In addition, "chat" history logged on the computer revealed that certain pictures were sent to Mr. Roberts by an individual, later identified as Larkin, who used the screen name "neon-angeleyes." Larkin sent sexually explicit photographs to Mr. Roberts and indicated that the depictions were of her daughter and that she had received a sum of money from him for their production.

The origin of the video file was traced to Cameron County, Pennsylvania. The Pennsylvania State Police were contacted and began an investigation jointly with agents from the Federal Bureau of Investigation. Angela Larkin was arrested by the Pennsylvania State Police and the Federal Bureau of Investigation for trafficking pictures of her daughter in violation of 18 U.S.C. § 2251(a). A two count indictment charging violations of 18 U.S.C. §§ 2251(a) (production of a sexually explicit visual depiction of a minor) and 2251(b) (production of

4

a sexually explicit visual depiction of a minor that was produced using materials shipped through interstate commerce) followed, to which Larkin entered not guilty pleas. The grand jury subsequently returned a superceding indictment, which charged Larkin with traveling through interstate commerce with co-defendant Richard King[3] with the intent to engage in a sex act with M.M., in violation of 18 U.S.C. §§ 2 and 2241(c).

Pursuant to a plea agreement, Larkin entered a plea of guilty to only the production charge, a violation of 18 U.S.C. § 2251(a). The plea agreement required Larkin to assist in the investigation and prosecution of the unlawful activities of others and, in exchange for her promised assistance, the government would consider filing a Motion for Downward Departure pursuant to U.S.S.G. § 5K1.1 on her behalf. Notwithstanding this possibility, the plea agreement contemplated a sentencing guideline range between 121 and 151 months, if the mandatory minimum of 180 months was inapplicable.

The Pre-Sentence Report prepared on May 17, 2006 also calculated Larkin's guideline range based upon an offense level of 34 and a criminal history category of II, which differed from

[3]King, who was sentenced prior to Larkin, received the same sentence as Larkin, which included three hundred sixty (360) months imprisonment.

5

the calculations in the plea agreement.[4]  The Probation Office calculation included the fact that B.L. was a second victim as well as a possible enhancement for the use of a computer in the commission of the offense, pursuant to U.S.S.G § 2G2.1(b)(3). The resulting guideline range was 168-210 months imprisonment.

Larkin advanced several objections to the Pre-Sentence Report including the propriety of categorizing B.L. as a second victim, whether the enhancement pursuant to § 2G2.1(b)(3)(B)(1) was applicable, and the inclusion of the mental health evaluations of her minor children.  Larkin also alleged that the government violated the plea agreement by briefing some of these issues.  On October 6, 2006, the District Court ruled on Larkin's objections to the Pre-Sentence Report and found no violation of the plea agreement by the government. With respect to the objections, the District Court concluded that the photographs of B.L. rendered her a second victim and that it could consider the mental evaluations of the minor victims for sentencing purposes.  But, the District Court found that the enhancement pursuant to § 2G2.1(b)(3)(B)(1) was inapplicable.

In the meantime, Larkin provided assistance to the government in the prosecution of other sex offenders.  As a result, on January 21, 2009, the government filed a Motion for

---

[4]The plea agreement stated Larkin's criminal history fell in Category I, but the Probation Office's calculation placed her criminal history in Category II.

Downward Departure pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(b). The parties submitted additional sentencing memoranda in March 2009, and, at the direction of the District Court, filed supplemental briefs addressing, *inter alia*, possible upward departures. The District Court not only rejected the government's recommendation for a downward departure, in an opinion issued on May 11, 2009, it also advised the parties of its intention to depart upward.

Larkin's sentencing hearing took place on May 22, 2009, at which time representatives for her two minor daughters presented testimony. The District Court sentenced Larkin to the maximum term of confinement of 360 months imprisonment. Larkin timely appealed.

## III. JURISDICTION

The District Court exercised jurisdiction pursuant to 18 U.S.C. § 3231. A final judgment of sentence was entered on May 22, 2009. We have appellate jurisdiction pursuant to 18 U.S.C. § 3742(a), as well as 28 U.S.C. § 1291.

## IV. DISCUSSION

*A.    Whether the Photographs of B.L. Qualify as Pornographic Under 18 U.S.C. § 2256(2)(B)(iii)*

Larkin pleaded guilty to a violation of 18 U.S.C. § 2251(a), which criminalizes the use of a minor to engage in sexually explicit conduct for the purpose of producing visual depictions of that conduct for distribution in interstate

7

commerce through the use of a computer. Larkin's charged offense conduct relates to photographs of M.M., her then two-year-old daughter. Of the several images generated by Larkin in the commission of this offense, there are five relevant to this appeal. The question presented is whether photographs of B.L., Larkin's then five-year-old daughter, were appropriately characterized by the District Court as "sexually explicit" so as to warrant considering B.L. as a second victim for purposes of calculating Larkin's sentencing guideline range.

The District Court examined these photographs and answered the question affirmatively. While any factual determinations made by the District Court are reviewed for clear error, Kosiba v. Merck & Co., 384 F.3d 58, 64 (3d Cir. 2004), the question of whether the photographs of B.L. depict lascivious conduct is one of statutory interpretation subject to *de novo* review. United States v. Knox, 32 F.3d 733, 744, 753 (3d Cir. 1994).

The definition of the term "sexually explicit" conduct is set forth in 18 U.S.C. § 2256(2)(B) and includes:

> (i) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited;
>
> (ii) graphic or lascivious simulated;

8

(I) bestiality;

(II) masturbation; or

(III) sadistic or masochistic abuse; or

(iii) graphic or simulated lascivious exhibition of the genitals or pubic area of any person.

18 U.S.C. § 2256(2)(B)(i)-(iii). The parties agree that the photographs before us potentially implicate only subsection (iii). A determination of whether these photographs depict lascivious conduct as defined by the statute is guided by a number of considerations, including, but not limited to, the six factors identified in United States v. Dost, 636 F. Supp. 828, 832 (S.D. Cal. 1986), which we formally adopted in United States v. Villard, 885 F.2d 117, 122 (3d Cir. 1989). Under this test, we consider:

1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;

2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4) whether the child is fully or partially clothed, or nude;

9

5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

Id. Considered generally, these are the hallmarks of lascivious conduct. But the Dost factors are not dispositive and serve only as a guide. See Doe v. Chamberlin, 299 F.3d 192, 196 (3d Cir. 2002) (citing Knox, 32 F.3d at 746 n.10 (stating that the list of considerations outlined in Dost is not exhaustive)).

In addition to the considerations detailed in Dost, we are guided by Black's Law Dictionary, which defines "lascivious exhibition" as "a depiction which displays or brings forth to view in order to attract notice to the genitals and pubic area of children, in order to excite lustfulness or sexual simulation in the viewer." Knox, 32 F.3d at 745 (citing Black's Law Dictionary 882 (6th ed. 1990)). We may also consider "any other relevant factors given the particularities of the case." Id. at 746 (citing Villard, 855 F.2d at 122). With these considerations in mind, we begin our review of the five photographs of B.L.[5]

---

[5]Importantly, the District Court concluded that Larkin was the photographer of the five images of B.L. We review this determination for clear error. Kosiba, 384 F.3d at 64. While our review of the record does not reveal any definitive statement by Larkin admitting to taking these photographs, there is enough

The first photograph depicts M.M. and B.L. sitting on a couch. The girls are fully clothed in age-appropriate, loose fitting dresses. Both girls have their right hands positioned near their crotch area. B.L.'s right hand appears to be resting on her right upper thigh, while M.M.'s hand is placed between her legs. Their skirts are gathered between their legs, but only enough to expose the skin just above their knees. As to their countenance, B.L. is smiling while M.M. looks anxious. We will refer to this photograph as the "couch photograph."

The second photograph depicts B.L. stepping into the tub, while M.M. looks on. Both girls are nude and the buttocks of M.M. are in the foreground. The faces of the girls are not captured in this photograph. The third photograph depicts both girls naked and in a bathtub. B.L. is sitting in the tub and her attention is focused on an object that she is manipulating with

---

evidence in the record related to her involvement with the photographs that could have provided the basis for the District Court's conclusion that she was in fact, the photographer. Specifically, the Pre-Sentence Report notes that Larkin admitted to the FBI that she had taken photographs of her daughter to sell to interested pedophiles over the internet. Also, in the course of her cooperation with the government, she never identified anyone else as the photographer who captured the images of her daughters who were the subject of her plea agreement. Based on these facts, the District Court's conclusion that Larkin took the photographs is not clearly erroneous.

her hands. M.M. is looking directly into the camera and is crouching down, appearing to be in the act of sitting. We will refer to these photographs collectively as the "bathtub photographs."

In the last two photographs, B.L. is alone, naked, and looking directly into the camera. Photograph number four is taken with the camera turned at a ninety degree angle producing a full length and close-up body depiction of her entire nude body. In photograph number five, B.L.'s head is in the upper right corner of the picture with her feet in the bottom left corner producing a diagonal frame of the image. We will refer to these pictures as "photograph number four" and "photograph number five," respectively.

In analyzing the photographs for the tell-tale markers of pornography, we apply the Dost factors. Our analysis begins with photograph number five, which depicts B.L. standing in the bathtub, leaning up against a shower wall. It depicts the presence of all but one of the Dost factors, because the photograph does not focus on B.L.'s genitalia.

Next, the setting of the photograph is a shower and is arguably sexually suggestive in this case, marking the presence of factor two. B.L. does not appear to be in the act of bathing, there is no water in the bathtub, and she does not appear wet. Standing alone, the setting is not commonly associated with sexual activity. But showers and bathtubs are frequent hosts to fantasy sexual encounters as portrayed on television and in film.

12

It is potentially as much of a setting for fantasy sexual activity as is an adult's bedroom. See Villard, 885 F.2d at 124 (noting that a bed or a mattress is often associated with sex, but on its own is not suggestive of sexual activity). Here, the fact that B.L. is standing in the tub coupled with her unnatural pose and the angle of the photograph suggests that the bathtub/shower, in this instance, was meant to convey to the intended viewer that the shower is a location for a potential sexual encounter with B.L. Cf., Doe v. Chamberlin, 299 F.3d 192 (no sexually suggestive setting in photographs of teenage girls showering after a day on the beach that did not include depictions of unclothed genitals).

Factors three (pose), four (nudity), and five (sexual coyness), are considered simultaneously because they overlap. Here, B.L.'s pose is unnatural for a child of her age and it gives us pause. The positioning of her head as resting on her shrugged shoulders as she attempts a smile appears to be at the direction of the photographer rather than a natural pose for a child of her age. Also, the diagonal framing of this photograph is unusual and adds to the sexual suggestiveness of the pose. This angle conflicts with what one would normally expect in a photograph taken by a parent for the purpose of capturing innocent candid shots of their child during bath-time; instead, it is more akin to a professional "photo shoot" where the "model" poses for the photographer. In addition, B.L. is completely nude, although this is not unusual given that she is in a bathtub.

The depiction in photograph number five presents a close

13

call. Standing alone, the presence of <u>Dost</u> factors two, three, four, and five may not support a finding of lasciviousness in this photograph. However, considered together, these factors take this picture out of the normal catalog compiled by parents of young children. Ultimately, it is <u>Dost</u> factor six that tips the balance on the side of qualifying the photograph as exhibiting lascivious conduct. Larkin trafficked this photograph over the internet to an interested pedophile, whom she acknowledged "would find them sexually stimulating because of his predilection for young children." Appellant's Brief at 18. This conduct distinguishes Larkin's case from the facts underpinning our decision in <u>Chamberlin</u>, because Larkin designed the image depicted in this photograph to arouse. 299 F.3d 192 (citing <u>United States v. Wiegand</u>, 812 F.2d 1239, 1244 (9th Cir. 1987) (A photograph that is intended to elicit a sexual response is one that is "presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur.")).

We caution that "lasciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or like minded pedophiles." <u>Wiegand</u>, 812 F.2d at 1244. <u>Villard</u> instructs that the focus must be on the *intended* effect, rather that the *actual* effect, on the viewer. 885 F.2d at 125.

> Child pornography is not created when the pedophile derives sexual enjoyment from an otherwise innocent photo. As the Ninth Circuit stated, "Private fantasies are not within the

14

statute's ambit." [United States v. Wiegand,] 812 F.2d at 1245. When a picture does not constitute child pornography, even though it displays nudity, it does not become child pornography because it is placed in the hands of a pedophile, or in a forum where pedophiles might enjoy it. Faloona v. Hustler Magazine, Inc., 607 F. Supp. 1341 (N.D.Tex. 1985) (nude pictures of children did not constitute child pornography when published in "legitimate" *Sex Atlas* or in "raunchy" *Hustler* magazine, because they did not depict children engaged in sexual conduct).

Villard, 885 F.2d at 125.

Larkin engineered photograph number five for the purpose of eliciting a sexual response.[6] We hold that the depiction in photograph number five meets the definition of "lascivious" as defined by 18 U.S.C. § 2251(2)(B)(iii).

---

[6]We reject Larkin's allegation that the "more likely scenario is that [she] already possessed these pictures of her daughters and later discovered that they would be sexually exciting to pedophiles." Appellant's Brief at 18-19. Larkin admittedly traded pictures over the internet to entice men for sex and for her own pecuniary gain. She was aware of her patrons' preferences and she catered to them. Supplemental Appendix ("Supp. App.") at 78-79. The image in photograph number five is engineered to achieve those goals.

15

We now turn to photograph number four, which captures B.L. standing at close range against what appears to be a wall. Nothing but B.L.'s entire nude body, with an emphasis on her breasts, is depicted in this photograph. Although the genitals are visible because the child is naked, factor one is not present because the focus is not on the genitalia. Likewise, factor two is not helpful because the setting cannot be discerned, as the image of the child fills the frame of the photograph.

We are concerned with the pose of the child. This does not appear to be a candid shot given that it is a full length close up depiction of a naked child who is standing with her arms at her side. B.L.'s pose appears unnatural; she is sheepishly looking into the camera, her shoulders slightly shrugged, and she appears to be pushing her arms against her sides to give the impression that she has developing breasts. Contrary to Larkin's contention, photograph number four is not the type traditionally taken by parents eager to preserve memories of their child. As to factor four, B.L. is completely nude. Factor five is not present as B.L.'s expression is unremarkable and cannot be characterized as portraying sexual coyness, or a willingness to engage in sexual activity.

We have the same concern with this photograph as we expressed in our analysis of photograph number five; standing alone, none of the identified Dost factors sufficiently demonstrate lasciviousness. But "given the particularities of the case," the presence of the sixth factor, which when coupled with the other factors, tips the scale in favor of categorizing the

16

image as lascivious. Knox, 32 F.3d at 746 (citation omitted).

Photograph number four was sent over the internet by Larkin to known pedophiles, including Thomas Redeker, with the title of "[B.L.'s] Boobies." Supp. App. at 78-79. The image in photograph number four is intended to elicit a sexual response by making it appear that B.L. has developing breasts within the same image as her unclothed genitals. Redeker confirmed that Larkin knew his preferences and was certain that Larkin sent him the image in photograph number four for his sexual pleasure. He also told agents from the Federal Bureau of Investigation that Larkin courted him by stating "I know what you like" and "[s]ee what you are missing." Id.

We are careful to note that our holding with respect to this image should not be construed to broaden the definition of "sexually explicit" to include images of a minor's breasts. Instead, consistent with our holding in Knox, "'lascivious exhibition of the genitals or pubic area' of a minor necessarily requires only that the material depict some 'sexually explicit conduct' by the minor subject which appeals to the lascivious interest of the intended audience." 32 F.3d at 747 (emphasis added). Here, the close-up image of B.L. standing in a manner that accentuates and calls attention to her breasts while nude sufficiently depicts lascivious conduct because its intent was to elicit a sexual response from Redeker.

Considered together, factors three, four, and six demonstrate the presence of conduct that would appeal to the

17

lascivious interest of an audience of pedophiles and, in particular, Redeker. Id. We hold that photograph number four depicts "lasciviousness" as defined by 18 U.S.C. § 2251(2)(B)(iii).

In sum, we find that the depictions contained in photograph number five and photograph number four meet the definition of lascivious conduct as defined in 18 U.S.C. § 2251(2)(B)(iii). As a result, we hold that the District Court properly considered B.L. as a second victim in calculating Larkin's guidelines.[7]

B. *Whether the Government's Conduct Violated the Terms of the Plea Agreement*

Larkin's contention that the government violated the plea agreement presents a question of law subject to plenary review.[8]

_____

[7] Whether the images contained in the first three photographs depict "sexually explicit conduct" is questionable. Because we hold that the visual depictions of B.L. contained in photographs four and five satisfy the definition contained in 18 U.S.C. § 2251(2)(B)(iii), it is unnecessary to determine whether the conduct captured in the first three photographs also falls within the statute's ambit.

[8] During the first Pre-Sentence Conference, the government agreed with the Probation Office's qualification of Larkin's criminal history as Category II, essentially stating that the

18

United States v. Moscahlaidis, 868 F.2d 1357, 1360 (3d Cir. 1989) (citing United States v. Miller, 565 F.2d 1273 (3d Cir. 1977)).

Strict compliance with the terms of a plea agreement is not only vital to the efficient function of our criminal justice system, but also required to preserve the integrity of our constitutional rights. Santobello v. New York, 404 U.S. 257, 262-63 (1971).

> This phase of the process of criminal justice, and the adjudicative element inherent in accepting a plea of guilty, must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea agreement rests in any significant degree on a promise or agreement of the prosecutor, so that it

---

Category I qualification in the plea agreement was erroneous. Appendix Volume II ("App. Vol. II") at 139 ("we were wrong about that too."). On appeal, the government states that Larkin failed to object to this statement. To the extent that the government is implying that Larkin waived appellate review of this issue by failing to object, Larkin's reticence does not constitute waiver. See Moscahlaidis, 868 F.2d at 1360 ("Even if we agree that appellant did not properly object to the plea agreement violation at the sentencing hearing, such a failure does not constitute a waiver.") (citations omitted).

19

can be said to be part of the inducement or consideration, such promise must be fulfilled.

Id. In applying Santobello, we strive to find a balance between the constitutional rights of a defendant and the integrity of the plea agreement. "Because the defendant, by entering into the plea, surrenders a number of her constitutional rights, 'courts are compelled to scrutinize closely the promise made by the government in order to determine whether it has been performed.'" United States v. Nolan-Cooper, 155 F.3d 221, 236 (3d Cir. 1998) (quoting United States v. Hayes, 946 F.2d 230, 233 (3d Cir. 1991)).

It is well settled that an analysis of whether there is a violation of the plea agreement proceeds under contract law standards. Nolan-Cooper, 155 F.3d at 236. In considering whether the government kept its promise, "we will not permit the government to rely upon a 'rigidly literal' approach to the construction of the terms of the plea agreement." United States v. Badaracco, 954 F.2d 928, 939 (3d Cir. 1992) (quoting Moscahlaidis, 868 F.2d at 1361). Rather, our consideration here is whether the government's conduct falls within the range of expectations reasonably understood by Larkin when she entered her plea of guilty. See Badaracco, 954 F.2d at 939 (Courts are to consider "whether the government's conduct is inconsistent with what was reasonably understood by the defendant when entering the plea of guilty.").

We undertake our review in three steps. Moscahlaidis,

20

868 F.2d at 1360; see also Nolan-Cooper, 155 F.3d at 235. First, we consider the relevant paragraphs from the plea agreement and a description of the alleged improper conduct of the government. Id. Second, we evaluate the conduct and determine whether it violates the government's obligations under the plea agreement. Id. If it is determined that the government breached its duty under the plea agreement, our third and final step is to fashion the appropriate remedy. Id.

The relevant portions of the plea agreement are as follows. Paragraph 11 includes a contemplated application of the United States Sentencing Guidelines ("guidelines") to Larkin's conduct which results in a guideline range between 121 and 151 months imprisonment. This assessment determines that § 2G2.1(b)(3)(B)(I), an enhancement for the use of a computer in the commission of the crime, does not apply to Larkin's sentencing conduct. Also contemplated is the applicability of certain enhancements totaling eight levels and the possibility of an adjustment under U.S.S.G. § 2G2.1(c) for a second victim.[9]

_____

[9]These enhancements include a 4 level age enhancement § 2G2.1(b)(1), a 2 level enhancement for parental relationship, § 2G2.1(b)(2), and a 2 level adjustment for obstruction of justice § 3C1.1. There is no disagreement between the parties that these recommendations were contained in the plea agreement; however, Larkin contends that the government was bound to recommend the guideline calculation contained in Paragraph 11 of the plea agreement, which calls for a total offense level of 32

21

Paragraph 11 further states:

> The defendant understands that none of these recommendations is binding upon either the United States Probation Office, which may make different findings as to the application of the United States Sentencing Commission Sentencing Guidelines to the defendant's conduct. *The defendant further understands that the United States will provide the Court and the United States Probation Office all the information in its possession which it deems relevant to the application of the United States Sentencing Commission Sentencing Guidelines to the defendant's conduct.*

App. Vol. II at 112-13, ¶11 (emphasis added).

Paragraph 27 of the plea agreement states:

> Nothing in this agreement shall restrict or limit the nature or content of the United States's motions or responses to any motions filed on behalf of the defendant. *Nor does this agreement in any way restrict the Government in responding to any request by the court for briefing, argument or presentation of evidence regarding the*

with the possible applicability of § 2G2.1(c), for involvement of a second victim, Larkin's then five year old daughter.

22

*application of the Sentencing Guidelines to the defendant's conduct, including but not limited to, requests for information concerning possible sentencing departures*.

Id. at 121, ¶27 (emphasis added).

Paragraph 15 provides:

> The defendant also understands that the United States will provide to the United States Probation Office all information in its possession which the United States deems relevant regarding the Defendant's background, character, cooperation, if any, and involvement in this or other offenses.

Id. at 115, ¶ 15.

Paragraph 18 provides:

> At the sentencing, the United States will be permitted to bring to the Court's attention, and the Court will be permitted to consider, all relevant information with respect to the defendant's background, character and conduct, including the conduct that is the subject of charges which the United States has agreed to dismiss, and the nature and extent of the defendant's cooperation, if any. The United States will be entitled to bring to the Court's attention and the Court will be entitled to consider any failure by the defendant to

23

fulfill any obligation under this agreement.

Id. at 116-17, ¶18.

According to Larkin, the government breached the plea agreement in various stages of the proceedings in this case. First, when it provided the United States Probation Office with a letter from a psychologist which supported the Probation Officer's suggestion that an upward departure for severe psychological injury may be applicable. Second, when it provided argument in favor of the application of an enhancement pursuant to U.S.S.G. § 2G2.1(b)(3) despite an agreement that the enhancement was inapplicable. Finally, by arguing in its Response to Defendant's Objections to the Pre-Sentence Report, Sentencing Memorandum and Supplemental Sentencing Memorandum, that upward departures may be warranted. We will address these allegations in turn.

### 1. The Letter of the Psychologist

Larkin contends that the government violated the terms of the plea agreement by submitting a letter from a psychologist, which supported the application of an upward departure based upon the severe injury likely suffered by Larkin's daughters as a result of her conduct, to the United States Probation Officer charged with preparing the Pre-Sentence Report.

The plea agreement plainly states that the government may "provide the Court and the United States Probation Office all information it deems relevant to the application of the United

24

States Sentencing Commission Sentencing Guidelines to the defendant's conduct." Id. at 113, ¶ 11. A letter from a psychologist detailing the impact of Defendant's conduct on her daughters' mental health is relevant to Larkin's conduct assessment and application of the Guidelines. In addition, while the government may be precluded from arguing in favor of an enhancement based upon these facts, passing this information along to the Probation Officer is within its obligations set forth in Paragraph 17, which details the right of the victims to be heard. See, e.g., United States v. Stemm, 847 F.2d 636, 639 (10th Cir. 1988) ("Disclosure of information as to the nature of the offense and each defendant's role is proper and within the Government's duty to provide, despite a promise that the Government would make no recommendation as to sentence.") (citations omitted).

Paragraph 17(b) expressly permits the government to consult with the victims and to make the views of the victims "regarding sentencing known to the Court." App. Vol. II at 116, ¶ 17. In addition, the record demonstrates that Larkin was informed on several occasions that the government was not precluded from providing the Court and/or the Probation Office with relevant information and that Paragraph 17 meant "that the victims . . . can present their views to the court through our office." Id. at 146 (Pre-Sentence Conference May 2006); Supp. App. at 107 (Sentencing Memorandum); App. Vol. II at 216 (Sentencing Hearing May 2009). The conduct of the government was permitted under a plain reading of the plea

25

agreement and should have been reasonably expected by Larkin. Indeed, Larkin agreed that the government could present evidence related to the impact her conduct had on her daughters.

> THE COURT: Well, you always have the right to object to it. And, you know, as it goes to a victim impact statement, you know setting aside your more technical argument that the United States can't present any testimony on potential enhancements, which I think we've dealt with, I don't think you can argue that they can't present victim impact information.

> MS. SHAPIRO: No, I don't think I can.

Supp. App. at 72 (Pre-Sentence Conference August 25, 2008).

More importantly, the government never expressly argued in favor of an enhancement on this ground, nor can its actions fairly be construed as an implicit violation of the terms of the plea agreement. As a result, we find that the government did not breach the plea agreement by supplying the Probation Office with the psychologist report.

### 2. The Enhancement Pursuant to U.S.S.G. § 2G2.1(b)(3)

Larkin next argues that the government violated the plea agreement by supplying briefing on the applicability of the sentencing enhancement pursuant to U.S.S.G. § 2G2.1(b)(3). Paragraph 11 of the plea agreement specifically states that U.S.S.G. § 2G2.1(b)(3) is inapplicable. Neither in the written

26

submissions filed with the District Court nor during the course of any of the hearings does the record reflect that the government *advocated* for the application of U.S.S.G. § 2G2.1(b)(3). However, at the behest of the District Court, the government provided an assessment of the law and the relevant facts that would support application of the enhancement.

On May 24, 2006, the District Court conducted a Pre-Sentence Conference during which it considered several objections, made by Larkin, to the Pre-Sentence Report, including an objection to the Probation Office's recommendation that an enhancement was warranted under § 2G2.1(b)(3). As a result of Larkin's objection, the following exchange took place:

> THE COURT: Well, I guess the point is, you know, is the government going to - - is the government going to contest the - - I understand the criminal history area, but that's different. I mean, we can't - - it is what it is. But as to this particular enhancement, this two level enhancement, having looked at it briefly, and only briefly, it appears that there is substantial unclarity in this area and I'm going to have to resolve it. But I don't have to resolve it if you don't want to fight it, because I think it's purely a judgment call.
>
> THE GOVERNMENT: And that's the problem.

27

I think it's so - - the lack of clarity, if the Probation Office thinks it's [the computer enhancement] appropriate, we'll explain their views as to why it's appropriate.

THE COURT: All right. Well, the bottom line is it should be briefed and then we'll allow you to do that.

THE GOVERNMENT: I mean, if the Probation Office, after this meeting, thinks it better to withdraw that, that's fine too. That's their position and we'll explain to the court to the best of our abilities their beliefs.

App. Vol. II at 140 (Pre-Sentence Conference May 24, 2006).

The government's Sentencing Memorandum does not request the application of the enhancement, but it does present the correct legal standard and offers facts relevant to the determination of whether U.S.S.G. § 2G2.1(b)(3) is applicable. Paragraph 27 expressly permitted the government to respond to the District Court's request for briefing on any issue related to the application of the guidelines to Larkin's conduct, including the relevancy of U.S.S.G. § 2G2.1(b)(3).

Larkin challenges this language as overly broad and argues that it cannot be used in a manner to undermine the more specific provisions in the agreement. See United States v. Rivera, 357 F.3d 290, 295 (3d Cir. 2004) (citing *Corbin on*

28

*Contracts § 24.23* (revised ed. 1998) ("If the apparent consistency is between a clause that is general and broadly inclusive in nature and one that is more limited and specific in its coverage, the more specific should . . . be held to prevail over the more general term"); see also *Restatement (Second) of Contracts § 203(c)* (specific terms and exact terms are given greater weight than general language)). In more specific terms, Larkin submits that Paragraph 27 cannot be construed in a manner that relieves the government of its burden to adhere to the stipulation regarding U.S.S.G. § 2G2.1(b)(3).

We are not convinced that Paragraph 27 is overly broad or was used in the manner described by Larkin. Importantly, the government's ability to provide information to the Court on possible sentencing departures is contingent upon a request from the District Court, and not the product of a catch-all provision that allows the government to "take any position" as to sentencing issues. This fact distinguishes the case *sub judice* from the plea agreement in Rivera, relied upon by Larkin.

In Rivera, the inclusion of a general provision in the plea agreement that "reserved the right to take any position with respect to the appropriate sentence" did not permit the government to argue in favor of a role enhancement where it had stipulated to a specific Base Offense Level. 357 F.3d at 295.

> Because the Offense Level was specifically stipulated to, whereas the government's right to advocate a role enhancement was not, the

29

government's endorsement of an enhancement that would raise the Offense Level above the stipulated level contravened the plea agreement. Moreover, to the extent there is ambiguity caused by the "little bit of poor draftsmanship" conceded by the prosecutor, we must construe the agreement against the government as drafter.

Id.

Here, Paragraph 27 does not give the government the same unfettered authority as the language in the Rivera plea agreement. Nothing in Paragraph 27 permitted the government to abandon specific stipulations in its response to the District Court's request for briefing; as a result, unlike Rivera, the government could not take "any position." Cf. id.

Parsing the language in a plea agreement is more than a semantical exercise, as we have consistently recognized the fine, but important, distinction between a promise to "take no position" and a promise to "make no recommendation." See United States v. Hall, 515 F.3d 186, 198 (3d Cir. 2008); United States v. Hayes, 946 F.2d 230, 234 (3d Cir. 1991). "The difference between the two terms is elementary, for the promise not to recommend is narrow, speaking only as to the sentence to be imposed, whereas a promise to take no position speaks to no attempt at all to influence the defendant's sentence." Miller, 565 F.2d at 1275. The government's obligations here were not impeded by a promise to "take no position." Instead, the

30

government agreed to recommend a sentence within the applicable guideline range and it was obligated to inform the District Court of "all information in its possession which it deems relevant" to sentencing. App. Vol. II at 113, ¶ 11. The government fulfilled its obligation to recommend a sentence within the guideline range and the plea agreement specifically permitted the government to supply the District Court with the information relevant to U.S.S.G. § 2G2.1(b)(3). See United States v. Horsfall, 552 F.3d 1275, 1282 (3d Cir. 2008) ("Because the agreement permitted the government to introduce such information and the government did not explicitly oppose a sentence within the guideline range, the government did not violate the plea agreement.") (citation omitted).

Although Paragraph 27 permits the government's response to the District Court's inquiry, it does create a tension between the District Court and the parties because it leaves open the possibility that a stipulation can become the subject of discussion at the request of the District Court, thereby creating an opportunity for the government to circumvent the plea agreement. Here, the oral argument and the brief submitted by the government do not cross the line between *providing* an analysis, which is expressly permitted by Paragraph 27, and impermissibly *advocating* for application of the enhancement. Cf., United States v. Hawley, 93 F.3d 682, 693 (10th Cir. 1996) (Finding statements "that do more than merely state facts or simply validate those facts found in the Pre-Sentence report [but rather] . . . provide a legal 'characterization' of those facts, and

31

'argue the effect' of those facts to the sentencing judge" violated the terms of the plea agreement.).

The brief sets forth the proper legal considerations in a straightforward manner. See United States v. Svacina, 137 F.3d 1179, 1185 (10th Cir. 1998) ("The government cannot be penalized for correctly stating the legal issue to be addressed by th[e] court."). In addition, the facts identified in the government's brief were well known to the District Court, as they were a boiled down recapitulation of the facts detailed in Larkin's Pre-Sentence Report.[10] Viewed against the entire factual backdrop of the proceedings in front of the District Court, the government's submission does not constitute a thinly veiled attempt to otherwise influence the District Court to apply the enhancement and did not offend its obligations under the plea agreement. To the contrary, the government expressly

---

[10]We reject the government's argument that because the District Court ultimately did not apply the enhancement, any hypothetical overstep by the government is excused. We have consistently held that "the doctrine that the government must adhere to its bargain in the plea agreement is so fundamental that even though the government's breach is inadvertent and the breach probably did not influence the judge in the sentence imposed, due process and equity require that the sentence be vacated." Nolan-Cooper, 155 F.3d at 237 (internal quotations omitted).

32

advocated for a sentence within the guidelines at various stages in the proceedings before the District Court.  App. Vol. II at 142 (Pre-Sentence Conference May 24, 2006); Supp. App. at 56 (Pre-Sentence Conference July 25, 2007); Id. at 107 (Sentencing Memorandum); App. Vol. II at 216 (Sentencing).

We also find that the government's conduct falls within the realm of actions Larkin would reasonably expect under the plea agreement.  The government's written and oral responses to the District Court's inquiry related to U.S.S.G. § 2G2.1(b)(3) were contemplated by Paragraph 27 and did not infringe on its obligations pursuant to Paragraph 11. See, Hall, 515 F.3d 186. The plea agreement expressly permitted the government to introduce the information it provided to the District Court and the government never argued, explicitly or implicitly, that U.S.S.G. § 2G2.1(b)(3) should be applied.

In sum, nothing the government did can aptly be characterized as impermissibly advocating for the application of U.S.S.G. § 2G2.1(b)(3) or violating the "spirit" of the agreement. See Badaracco, 954 F.2d at 940.  The government's actions were permitted by the plea agreement and we find no breach. See Horsfall, 552 F.3d at 1282 (citing United States v. Levy, 374 F.3d 1023, 1030-32 (11th Cir. 2004) (finding no breach where the government was permitted by the plea agreement to introduce certain evidence and it upheld its obligation to make a specific sentencing recommendation)).

3. *Upward Departure Arguments*

33

Larkin's final argument also implicates Paragraph 27 and alleges that the government made an impermissible argument on applicable upward departures in its Sentencing Memoranda.[11] Although the parties each submitted two briefs to the District Court, the record before us contains only the government's submissions, filed with the District Court on March 26, 2009 and April 17, 2009.

Larkin characterizes specific statements within these two briefs as advocating for upward departures from the stipulated guideline range. During its discussion on Larkin's offense level, the government's brief informed the District Court that "other pertinent details are not included in this assessment which are worth noting when considering the seriousness of the offense and the need to provide just punishment for the offense." Supp. App. at 14. The government then offered that "a factor not considered by the guidelines but reflective of the seriousness of the offense is its duration which spanned intermittently approximately one year." Id. at 15. Other examples in the brief include the fact that Larkin sent the pictures for pecuniary gain and that the victims of her crime suffered. Taken together,

---

[11]Larkin also reiterates that Paragraph 27 is overly broad and, therefore, cannot be invoked to undermine more specific paragraphs. We dispose of Larkin's argument regarding the broad nature of Paragraph 27 for the reasons identified in our analysis of the government's conduct with respect to the application of U.S.S.G. § 2G2.1(b)(3).

Larkin argues that the implicit message to the District Court was that the applicable guideline range was inadequate.

All of these arguments were made with respect to the non-guideline sentencing considerations set forth in 18 U.S.C. § 3553. See Gall v. United States, 552 U.S. 38, 49-50 (2007) (directing that the sentencing of federal criminal defendants must include detailed consideration of the factors set forth in 18 U.S.C. § 3553). While the plea agreement sets forth a contemplated guideline range, the government never agreed to recommend a specific sentence within that range. Thus, its inclusion of other factors not considered by the guidelines is consistent with its burdens under 18 U.S.C. § 3553(a) and can fairly be construed as providing a factual basis for a sentence at the higher end of the range. To the extent that these factors are also the basis for upwardly departures, because the government was responding to a request from the District Court consistent with Paragraph 27, it did not step outside the bounds of the plea agreement.[12]

Inasmuch as the government's declarations do not

---

[12]Larkin's argument that the government provided this argument under its own initiative is unpersuasive. While the time line of the briefings initially appears to support Larkin's theory that there was no Paragraph 27 request by the District Court, further review of the proceedings leads to the inevitable conclusion that the government's submissions were made in response to a request by the District Court.

35

inherently violate its obligations under the plea agreement, the fact that they were made in response to the District Court's request provides additional propriety for their inclusion in the written submissions. Moreover, the government consistently argued for a sentence within the applicable guideline range. For all of these reasons, we find no breach of the plea agreement.

> C.     *Whether the District Court Violated the Ex Post Facto Clause of Article I of the United States Constitution When it Upwardly Departed Five Levels*

The criminal conduct underlying Larkin's indictment occurred on September 15, 2003. Under the version of U.S.S.G. § 2G2.1 (2002) in effect on the date of Larkin's criminal conduct, her base offense level totaled twenty seven (27). Effective November 1, 2004, the United States Sentencing Commission amended U.S.S.G. § 2G2.1, the sentencing guideline that governs Larkin's conduct, to include several bases for enhancements.[13] Direct application of the amended version

---

[13]On April 30, 2003, prior to the date of Larkin's offense conduct, the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (the "PROTECT Act"), Pub. L. 108-21, was signed into law. The PROTECT Act increased the mandatory minimum term of imprisonment for violations of 18 U.S.C. § 2251 from ten to fifteen years. In part, several amendments to the guidelines were in response to the PROTECT Act and the perceived increase in the rate of

36

of U.S.S.G. § 2G2.1 (2009) results in a base offense level of thirty two (32). Larkin was sentenced on May 22, 2009.[14] Larkin claims that the District Court improperly relied upon the 2009 edition of the Guideline Manual in rendering its decision to depart upward five levels pursuant to U.S.S.G. § 5K2.0 in violation of the ex post facto clause of Article I of the United States Constitution.[15] We review this decision under a *de novo*

---

departures from the guidelines. United States v. Arrelucea-Zamudio, 581 F.3d 142, 146 (3d Cir. 2009).

[14]Generally, a sentencing court is required to apply the guidelines in effect at the time of the defendant's sentencing, consistent with ex post facto considerations. See United States v. Cherry, 10 F.3d 1003, 1014 (3d Cir. 1993); United States v. Kopp, 951 F.2d 521, 526 (3d Cir. 1991); 18 U.S.C. § 3553(a)(4); U.S.S.G. § 1B1.11(a) (1993).

[15]Pursuant to United States v. Koon, there are several determinations that a sentencing court must make when considering a departure pursuant to § 5K2.0. 518 U.S. 81, 96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Namely:

> 1) What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?
> 2) Has the Commission forbidden departures based on those features?
> 3) If not, has the Commission encouraged

standard.

Where an amendment to a section of the sentencing guidelines occurs following the convicted offense conduct and the amendment results in harsher penalties than were in effect at the time of the conduct, the ex post facto clause and U.S.S.G. § 1B1.11(a) (1993) both require the District Court to apply the sentencing guidelines in effect on the date that the offense of conviction was committed. <u>Miller v. Florida</u>, 482 U.S. 423, 431-35, 107 S.Ct. 2446, 2451-54, 96 L.Ed.2d 351 (1987). Because subsequent changes in the sentencing guidelines in effect at the time of Larkin's sentence would result in the imposition of a harsher punishment, the District Court was required to sentence Larkin according to the 2002 Guideline Manual, which was in effect on the date of the charged offense conduct on September 13, 2003.[16] <u>United States v. Menon</u>, 24 F.3d 550, 566 (3d Cir. 1994); <u>see also</u> U.S.S.G. § 1B1.11(b)(1).

The District Court appropriately considered Larkin's

---

departures based on those features?
4) If not, has the Commission discouraged departures based on those features?
<u>Id.</u> (citing <u>United States v. Rivera</u>, 994 F.2d 942, 949 (1st Cir. 1993)).

[16]However, the PROTECT Act, having been signed into law prior to Larkin's offense date of September 15, 2003, applies to her sentence structure.

38

conduct under the 2002 edition of the Guideline Manual and concluded that an upward departure was warranted pursuant to U.S.S.G. § 5K2.0 on the ground that U.S.S.G. § 2G2.1 (2002) did not adequately consider the severity of Larkin's conduct. Specifically, the applicable guideline did not account for the fact that: 1) Larkin permitted pedophiles to have sexual contact with M.M.; 2) Larkin distributed materials involving the exploitation of a minor; 3) Larkin distributed these materials for pecuniary gain; and 4) Larkin's conduct was extreme.

In justifying the imposed sentencing enhancements, the District Court relied upon, *inter alia*, the fact that the amended version of U.S.S.G. § 2G2.1 (2009) specifically contemplated enhancements for the identified conduct.[17] We have consistently held as improper the direct application of an amended guideline to conduct that occurred *prior* to the amendment. See, e.g., United States v. Wood, 486 F.3d 781 (3d Cir. 2007). Analogizing to an amended guideline, however, does not offend the ex post facto clause.

We agree with the Seventh Circuit that a sentencing court "may interpret the Commission's later addition of an aggravating

---

[17]As amended, U.S.S.G. § 2G2.1 permits a two-level enhancement "[i]f the offense involved the commission of a sexual act or sexual contact" and a two level enhancement for the distribution (Larkin was charged with possession) of materials involving the exploitation of a minor. U.S.S.G. Supp. to App. C, Amend 664.

39

element as a sentencing factor as evidence that a previous version of the Guidelines did not adequately consider that factor in the sentencing scheme" while cautioning that "subsequent amendments are only to be used as tools in making a well-reasoned, individualized determination of whether to impose an upward departure in a particular case or to determine the degree of departure that is warranted." See United States v. Coe, 220 F.3d 573, 578 (7th Cir. 2000). We can find no better evidence of the inadequacy of a sentencing guideline than a subsequent amendment to that guideline to include and qualify previously unmentioned components of the convicted offense. For this reason, we recently joined the First, Fourth, and Seventh Circuits in holding that reliance on Congress's decision to amend a guideline provision as evidence that the applicable guideline is inadequate, is proper. United States v. King, 604 F.3d 125, 142 (3d Cir. 2010).

We are convinced, after a review of the record, that the District Court's sentence of Larkin did not improperly rely on an amended version of § 2G2.1. See United States v. Kikumura, 918 F.2d 1084, 1113 (3d Cir. 1990) overruled on other grounds by United States v. Fisher, 502 F.3d 293 (3d Cir. 2007) (analogies to other guidelines is permissible). The District Court's analogy to the amendment to § 2G2.1 was proper and did not violate the letter or the spirit of the ex post facto clause.

40

King, 604 F.3d 142.[18]

### D.    The Reasonableness of Larkin's Sentence

Larkin's final argument is that the imposed sentence of thirty years imprisonment is unreasonable. In determining the reasonableness of a sentence, we give great deference to "[t]he sentencing judge [who] is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." Gall, 552 U.S. at 51 (internal quotations and citations omitted); see also United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (we give "deference to the District Court because it is in the best position to determine the appropriate sentence in light of the particular circumstances of the case." (internal quotations and citations omitted)). The reasonableness of the District Court's sentence

---

[18]At Sentencing, following its determination that an upward departure was warranted, the District Court stated that "had I not departed upward, under § 5K2.1, as I did in my prior order, I would vary up to a sentence at the same level that I'm about to give you." App. Vol. II at 222. Having found no violation of the ex post facto clause, we need not endeavor to determine whether the District Court could have "varied up" to the sentence it ultimately imposed. Therefore, we will not address Larkin's argument that the District Court failed to offer a basis for a variance.

is reviewed under an abuse of discretion standard. United States v. Jackson, 523 F.3d 234, 243 (3d Cir. 2008).

Consistent with our post-Booker[19] precedent, District Courts engage in a three step process when imposing a sentence. United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006); United States v. King, 454 F.3d 187 (3d Cir. 2006). First, as was done in the pre-Booker era, the defendant's guideline range is calculated. See id. Second, the sentencing court must issue formal rulings on any departure motions on the record and, to the extent it grants a motion, it must then articulate "how that departure affects the Guidelines calculations." King, 454 F.3d at 196. Third, the factors enumerated in 18 U.S.C. § 3553(a) are considered "in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines." Gunter, 462 F.3d at 247 (footnote omitted). The § 3553(a) factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate

---

[19]United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

42

deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for-- (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .

(5) any pertinent policy statement . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Although Larkin complains about the overall reasonableness of the sentence, her chief allegation is that the District Court failed to sufficiently account for the similarity in the sentence between herself and her co-defendant, Richard King. Both Larkin and King received the same sentence despite the fact that Larkin provided substantial assistance to the government, as set forth in the government's § 5K1.1 motion for

43

downward departure.[20]  Thus, Larkin's complaint implicates both procedural and substantive error.

"[W]here a district court's sentence is procedurally sound, we will affirm it unless no reasonable sentencing court would have imposed that same sentence on that particular defendant for the reasons the district court provided." United States v. Tomko, 562 F.3d 558, 568 (3d Cir. 2009).  In deference to this principle, we will first address the procedural argument.

Procedural errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a)

---

[20]Even in the post-Booker landscape, we have consistently declined to review the discretionary decision of the District Court not to depart, unless there is a claim of legal error. See United States v. Cooper, 437 F.3d 324, 332-33 (3d Cir. 2006) (surveying the relevant precedent both pre and post Booker). Larkin makes no claim for legal error in the District Court's refusal to grant the government's § 5K1.1 motion. To the extent that she is alluding that the refusal to grant that motion is a factor in the unreasonableness of the sentence, the propriety of the District Court's refusal is not properly before us and we decline to address it. See United States v. Pellulo, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.").

44

factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range." Gall, 552 U.S. at 51. Based on our review of the record, we find no procedural error. At the sentencing hearing, the District Court expressly considered the similarity of Larkin's sentence to King's sentence as required by § 3553(a)(6).

> Finally, I want to address the sixth factor under section 3553(a), which is the need to avoid unwarranted sentencing disparities for defendants with similar records and in particular, Mr. King, the co-defendant in this case. As we know, he pled guilty to interstate travel with a minor under 12. And that's an offense with which you were also charged.
>
> Mr. King's relevant conduct included physical contact with your daughter, prior abuse of his own daughter, distribution of child pornography and obstructing the investigation. But you solicited the sexual contact that Mr. King had with your daughter. You were present for and a participant in nearly all of the abuse that Mr. King perpetrated on your daughter. And you abused the second victim; just like Mr. King also, your own child. And you distributed pornography. And you obstructed justice by asking others to commit perjury. And you

45

directed others to destroy or conceal evidence of your offense. Your first words to the investigating agent in this case, and I'm paraphrasing, were how do I get myself out of this. Well, you didn't and you can't.

You engaged in substantially similar conduct to Mr. King. And I might agree with the contention that your conduct was worse. I don't know how you could be subject to less severe punishment under the circumstances, and you won't be.

App. Vol. II at 221-22.

In addition, even though the sentence imposed was outside the applicable guideline range, it was procedurally sound and not unreasonable. See Gall, 552 U.S. at 51 ("[I]f the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance."). Here, the District Court's analysis of factor (a)(6) consists of more than mere boiler-plate language and demonstrates both thoughtful and meaningful consideration. "The touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." United States v. Grier, 475 F.3d 556, 571 (3d Cir. 2007) (en banc).

We have long required that sentencing courts give

46

"meaningful consideration" to all of the § 3553(a) factors. "Meaningful consideration" requires more than mere recitation that the factors have been considered. United States v. Cooper, 437 F.3d 324, 329 (3d Cir. 2006). A review of the entire record demonstrates that the District Court gave thoughtful and "meaningful consideration" of all of the circumstances that impacted Larkin's sentence, including subsection (a)(6) of § 3553. Id. (noting that a sentencing court need not "discuss and make findings as to each of the § 3553(a) factors if the record makes clear the court took the factors into account in sentencing.") We conclude that the District Court laid the proper foundation and appropriately applied the § 3553(a) factors in formulating Larkin's sentence.

> I have considered all of the 3553 (a) factors carefully, dispassionately, although this is a case that triggers passion. I have given great consideration to all of the circumstances that I have before me in the voluminous submissions by counsel. I will note that had I not departed upward under 5K2.1, as I did in my prior order, I would vary up to a sentence at the same level that I'm about to give you.

> I take no joy in this. This is the worst case. This is the ugliest, most difficult case I have ever seen in my seven years on the bench. And in fact, other than homicides, wanton killings, this is the worst case that I have seen not only in the seven

47

years on the bench but in 22 years of lawyering before that.

App. Vol. II at 222.

The District Court's sentence was procedurally sound and therefore entitled to a presumption of reasonableness. The District Court was free to, and did, exercise its discretion in imposing sentence. Whether, as argued, there was room here for a lower sentence, we have considered that argument and conclude that the sentence imposed was not unreasonable. Our decision today is reinforced by Gall, which reminds us that "[t]he fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." Gall, 552 U.S. at 51. Therefore, we will affirm the sentence imposed by the District Court.

## V. CONCLUSION

We hold that the photographs of B.L. were sexually explicit and, therefore, she was properly considered a second victim in calculating Larkin's sentence. We further hold that the government did not breach the plea agreement by providing the District Court with briefing on the applicability of § 2G2.1(b)(3)(B)(I). Finally, we hold that there was no violation of the ex post facto clause by the District Court and that the sentence imposed was reasonable.

For these reasons, we affirm the decision of the District

Court.