**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2577
_____

UNITED STATES OF AMERICA

v.

EVERETT C. MILLER,
                    Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. No. 1-13-cr-00451-001)
District Judge: Honorable Renee M. Bumb
_____

Submitted Under Third Circuit LAR 34.1(a)
March 15, 2016
_____

Before: FUENTES, CHAGARES and RESTREPO, *Circuit Judges*.

(Filed: August 12, 2016)
_____

Richard Sparaco, Esq.
1920 Fairfax Avenue
Cherry Hill, NJ 08003
          *Counsel for Appellant*

Mark E. Coyne, Esq.
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

Norman Gross, Esq.
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street
Camden, NJ 08101
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

RESTREPO, *Circuit Judge*.

Appellant Everett C. Miller sold investors over $41 million in phony "promissory notes" and then squandered their money. Miller pled guilty to one count of securities fraud, 15 U.S.C. § 78j(b), and one count of tax evasion, 26 U.S.C. § 7201. He was sentenced to 120 months' imprisonment. Miller argues that the District Court improperly applied the Sentencing Guidelines investment adviser enhancement, U.S.S.G. § 2B1.1(b)(19)(A)(iii), because he was not an "investment adviser," as defined by the Investment Advisers Act of 1940, 15 U.S.C. § 80b-2(a)(11). This claim requires us to interpret the statutory definition of "investment adviser" for the first time. Miller also argues that the Government breached his plea agreement and that his sentence is substantively unreasonable. We will affirm.

**I**

**A**

Miller was the founder, chief executive and sole owner of Carr Miller Capital, LLC ("Carr Miller"), an investment and financial services firm. Carr Miller was based in New Jersey and had more than thirty affiliates and related entities. Carr Miller received

2

over $41.2 million in capital, from more than 190 investors, between June 2006 and December 2010.

Miller was a registered investment adviser representative under New Jersey securities law. While he had little formal education—a high school GED— Miller passed several securities industry examinations (Series 7, 24, 55, 63 and 65). The District Court found that he "maintained a public persona of a very successful entrepreneur." App. 293.[1]

Through Carr Miller, Miller sold investors "Carr Miller Capital promissory notes," which were securities under the Securities Act of 1933 and the Securities Exchange Act of 1934, 15 U.S.C. §§ 77b(a)(1), 78c(a)(10), and not exempt from federal or state registration requirements. App. 83. Miller did not register the notes. The Carr Miller notes promised annual returns of between 7 and 20 percent, which varied by investor, plus the return of the principal after nine months. These promises, of high returns and no risk, were false.

Miller deceived his investors in at least three ways. First, Carr Miller operated, in part, as a Ponzi scheme. Carr Miller spent approximately $11.7 million of its investors' principal to repay earlier investors. Second, Carr Miller invested in risky business ventures without informing its investors. Carr Miller lost approximately $15.7 million of

---

[1] State and federal authorities have since revoked Miller's registration as an investment adviser representative and have barred him from association with the securities industry. *In re Miller*, Investment Advisers Act Release No. IA-3840, 108 SEC Docket 4484 (May 30, 2014); *In re Cap. Mkts. Advisory, LLC*, Summary Order, 2010 WL 6363111, ¶ 3 (N.J. Bureau Sec. Dec. 20, 2010); *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (holding that courts may take judicial notice of SEC filings that are matters of public record).

$22.9 million invested by the firm. Third, Carr Miller comingled investors' funds in seventy-five related bank accounts, which Miller then tapped like a "credit card" for Carr Miller overhead and his own expenses. App. 293. Miller spent lavishly on luxury cars, home furnishings, electronics, vacations and tickets to entertainment and sporting events.

Carr Miller began to unravel when the Arkansas Securities Department opened an investigation of an affiliate in August 2009. This investigation put Miller on notice that his promissory notes were unregistered securities. This did not stop him. After becoming aware of the investigation, Miller knowingly sold almost $5 million in promissory notes to forty new investors. He did not return any of their principal. Instead, Miller used a portion of the funds to repay earlier investors and spent the balance of the money on Carr Miller overhead and his own expenses. This period of the Carr Miller fraud, from August 2009 to December 2010, formed the basis of Miller's securities fraud conviction and led to a stipulated loss amount of $2.5 to $7 million.

**B**

Miller pled guilty pursuant to a plea agreement and a cooperation agreement. The parties stipulated to a combined offense level of 29, followed by a 3-level reduction for acceptance of responsibility. *See* U.S.S.G. § 3E1.1. The parties agreed that a sentence within the Guidelines range for offense level 26 would be reasonable.

Under the cooperation agreement, Miller agreed to provide substantial assistance in exchange for the Government's downward departure motion. *See* U.S.S.G. § 5K1.1. Miller cooperated with the Government and with a state court receiver for Carr Miller. He helped the Government trace investors' "money through the labyrinth of bank

4

accounts and financial transactions" in order to determine the restitution owed. App. 234.

In exchange, the Government filed a Section 5K1.1 departure motion. The motion

requested a downward departure of "'3 levels from the parties' stipulated offense level of

26,' to 'offense level 23.'" Br. for Appellee 27 (quoting App. 360).[2]

## C

At Miller's sentencing, three issues arose that are the subject of this appeal. First,

the District Court imposed the investment adviser enhancement, which Miller argues is

inapplicable. Second, the Government made sentencing recommendations, which Miller

contends breached the plea agreement. Third, the District Court imposed an upward

variance, resulting in a sentence that Miller claims is substantively unreasonable.

## 1

The District Court applied the 4-level investment adviser enhancement. The plea

agreement was silent as to this enhancement, which was recommended later in the

Presentence Report. Miller objected to the enhancement, but the District Court rejected

his argument that he did not meet the definition of an "investment adviser." The District

Court did grant a 3-level downward departure. However, having added 4 levels for the

investment adviser enhancement, the downward departure was from offense level 30 to

27, rather than from 26 to 23.

---

[2] We cite to Appellee's brief, which is not sealed, in lieu of the sealed cooperation agreement and 5K1.1 motion. *See United States v. Foy*, 803 F.3d 128, 139 n.3 (3d Cir. 2015).

**2**

At sentencing, the District Court asked the Government for its sentencing recommendation. Consistent with the 5K1.1 motion, the Government stated that it was requesting a sentence at "offense level 23." App. 273. The Government reiterated its position that a sentence at offense level 26 would be "before the three level downward departure" and that after the departure "it would be a 23." App. 274. When requesting offense level 23, the Government reaffirmed that it was "abiding by the terms of our plea agreement." App. 273.

Defense counsel interjected that the District Court had granted the 5K1.1 downward departure from offense level "30 to 27." App. 274. Defense counsel stated, "I think in so doing, that's in contradiction to the plea agreement . . . ." App. 274. In response, the District Court suggested that Government request an additional one-level downward departure to level 26. The Government agreed that this would be "reasonable." App. 275. However, the District Court did not depart below level 27.

**3**

The District Court also imposed an upward variance of 2 levels based upon the Section 3553(a) factors. *See* 18 U.S.C. § 3553(a). This produced a final offense level of 29 and a Guidelines range of 97 to 121 months' imprisonment. The District Court stated that it would have varied upward more but for Miller's poor health.[3] The District Court's sentence of 120 months was within the Guidelines range.[4]

---

[3] In 1996, Miller was crushed by a snapped crane cable while working as a commercial deep sea diver. Miller has spinal cord stimulators and a battery pack

**II**

Miller first challenges the application of the Sentencing Guidelines investment adviser enhancement, U.S.S.G. § 2B1.1(b)(19)(A)(iii).[5] He contends that he was not an "investment adviser," as defined by the Investment Advisers Act of 1940, 15 U.S.C. § 80b-2(a)(11). The interpretation of this statutory definition is a matter of first impression in this Circuit.

**A**

We exercise plenary review of a district court's interpretation of the Sentencing Guidelines. *United States v. Richards*, 674 F.3d 215, 219 (3d Cir. 2012). We review a factual challenge to the application of the Guidelines for clear error. *Id.* at 220.

In the instant case, we consider a Guideline enhancement that incorporates a statutory definition. "Our goal when interpreting a statute is to effectuate Congress's intent." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 295 (3d Cir. 2012). "[W]e begin with the language of the statute itself." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 16 (1979). "In trying to divine the intent of Congress, we should consider the

---

implanted in his abdomen to provide motor function and control pain. According to defense counsel, the implants must be surgically replaced every eight to ten years; they were last replaced via a series of surgeries in 2014 and 2015.

[4] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction over this timely appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

[5] The investment adviser enhancement has been renumbered several times since its enactment in 2003. *See* U.S.S.G. App. C (Vol. II), Amend. 653. It was previously codified at U.S.S.G. §§ 2B1.1(b)(14)(A), (15)(A), (16)(A), (17)(A) and (18)(A).

entire scope of the relevant statute," including its larger structure. *Hagans*, 694 F.3d at 295.

B

Our starting point is the text of the investment adviser enhancement, which provides: "If the offense involved . . . a violation of securities law and, at the time of the offense, the defendant was . . . *an investment adviser*, or a person associated with an investment adviser . . . increase by 4 levels." U.S.S.G. § 2B1.1(b)(19)(A)(iii) (emphasis added). This enhancement adopts the definition of "investment adviser" set forth by the Investment Advisers Act of 1940 ("the Act"), 15 U.S.C. § 80b-2(a)(11). *See* U.S.S.G. § 2B1.1, cmt. n.15(A).

The Act "was the last in a series of [a]cts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963). Under the Act, investment advisers have fiduciary duties to their clients. *Id.* at 201; *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 501 (3d Cir. 2013). Non-exempt investment advisers must register with the Securities and Exchange Commission ("SEC") and all investment advisers are prohibited from engaging in fraud. *Goldstein v. SEC*, 451 F.3d 873, 876 (D.C. Cir. 2006) (citing 15 U.S.C. §§ 80b-3, 80b-6).

In the instant case, the disputed provision of the Act is the definition of "investment adviser."

> "Investment adviser" means any person who, *for compensation, engages in the business of advising others*, either directly or through publications or writings, as to the

8

> value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities . . . .

15 U.S.C. § 80b-2(a)(11) (emphasis added).

The Act goes on to enumerate exemptions from this definition, 15 U.S.C. § 80b-2(a)(11)(A)-(G), and authorizes the SEC to exclude other people by rule or order, 15 U.S.C. §§ 80b-2(a)(11)(H). *See Lowe v. SEC*, 472 U.S. 181, 204 (1985) (describing the structure of the definition). No exception applies to Miller. This structure demonstrates Congressional intent to define "investment adviser" broadly while carving out exemptions. *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 484 (D.C. Cir. 2007).

## C

Miller contends that he does not meet the definition of an "investment adviser" for three reasons: (1) he was not "in the business" of providing securities advice; (2) he did not provide securities advice "for compensation" and (3) he was not a registered investment adviser. We address each issue in turn.

## 1

Miller argues that he was not "in the business" of providing securities advice because he personally advised only Carr Miller's *initial* investors. Later, brokers trained by Miller met with potential investors. Our analysis of the "in the business" requirement proceeds in two steps. First, we must determine if and when Miller provided securities advice. Second, we must determine whether Miller was "in the business" of doing so.

9

Miller provided securities advice by personally advising individuals to invest in Carr Miller promissory notes. At his guilty plea, Miller agreed that he "and others falsely represent[ed] to the investor[s] that their monies would be invested in certain ways." App. 71. Miller conceded at sentencing that he gave personalized advice to approximately ten investors. The District Court found that "[i]t's clear from reading the [Presentence Report] that [Miller] advised various victims." App. 200.

In response, Miller argues that he did not personally meet with any Carr Miller investors during the specific time period charged in the Information. However, this argument fails to account for the relevant conduct Guideline, U.S.S.G. § 1B1.3(a)(2), which is applicable to the investment adviser enhancement. *United States v. Siddons*, 660 F.3d 699, 707 (3d Cir. 2011); *see also* U.S.S.G. § 3D1.2(d) (providing that U.S.S.G. § 2B1.1 is a groupable offense). Under this Guideline, a sentencing court considers not only convicted conduct, but also a defendant's acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2); *see also* U.S.S.G. § 1B1.3, cmt. n.9 (describing common scheme or plan and course of conduct). Miller has never challenged the District Court's finding, with which we agree, that his meetings with Carr Miller investors were relevant conduct.

Having established that Miller provided securities advice, the question that follows is whether he was "in the business" of doing so. We have not previously interpreted the phrase "in the business," which the Act does not define. The SEC has issued an interpretive release ("SEC Release"), which provides the following guidance:

> Whether a person giving advice about securities for compensation would be "in the business" of doing so, depends upon all relevant facts and circumstances. The staff considers a person to be "in the business" of providing advice if the person: (i) *Holds himself out as an investment adviser or as one who provides investment advice*, (ii) receives any separate or additional compensation that represents a clearly definable charge for providing advice about securities . . . or (iii) on anything other than rare, isolated and non-periodic instances, provides specific investment advice.

Applicability of the Investment Advisers Act, Investment Advisers Act Release No. 1092, 52 Fed. Reg. 38400, 38402 (Oct. 16, 1987) (emphasis added).

This SEC Release represents only the views of the SEC staff. *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 221 n.24 (3d Cir. 2006). We defer to it because of the SEC's expertise and the "'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Gonzales v. Oregon*, 546 U.S. 243, 269 (2006) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).[6] In doing so, we join the Tenth and Eleventh Circuits, which have also relied on the SEC Release. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1163 (10th Cir. 2011); *United States v. Elliott*, 62 F.3d 1304, 1310, 1311 n.8 (11th Cir. 1995). "No clearer alternatives

---

[6] The SEC Release is consistent with a prior interpretive release on the same issue. In relevant part, it reorganizes and enumerates guidance that was previously written in narrative form. *Compare* Applicability of the Investment Advisers Act, Investment Advisers Act Release No. 1092, 52 Fed. Reg. 38400, 38402 (Oct. 16, 1987), *with* Applicability of the Investment Advisers Act, Investment Advisers Act Release No. 770, 46 Fed. Reg. 41771, 41773 (Aug. 18, 1981).

11

are within our authority or expertise to adopt; and so deference to the agency is appropriate . . . ." *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008).[7]

Applying the SEC's guidance, we hold that Miller was "in the business" of providing securities advice because he held himself out as a person who provides investment advice. *See* SEC Release, 52 Fed. Reg. at 38402. Miller was a registered investment adviser representative, which may involve rendering securities advice. N.J. Stat. Ann. § 49:3-49(s); *see also In re Capital Mkts. Advisory*, 2010 WL 6363111, ¶ 3 (revoking Miller's registration). Miller also held himself out as an investment adviser in his personal meetings with Carr Miller investors.[8] We therefore conclude that Miller's conduct was exactly the type that is contemplated under the investment adviser enhancement.

**2**

Miller next argues that he was not an "investment adviser" because he did not provide securities advice "for compensation" as required by the Act. 15 U.S.C. § 80b-2(a)(11). Again, this analysis requires two steps. First, we must determine whether Miller provided securities advice—a question we have answered affirmatively. Second, we must determine whether he did so "for compensation."

---

[7] We choose to defer to the SEC Release under *Skidmore*. We need not decide whether the SEC Release requires *Chevron* deference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *cf. Hagans*, 694 F.3d at 303 (declining to apply *Chevron* deference to a Social Security Administration acquiescence ruling).

[8] Because we hold that Miller was "in the business" of providing securities advice by personally advising some Carr Miller investors, we do not reach the District Court's alternative finding that Miller was "in the business" of providing securities advice by managing Carr Miller's money.

12

The Investment Advisers Act does not define "compensation." The SEC Release defines compensation as "any economic benefit, whether in the form of an advisory fee or some other fee relating to the total services rendered, commissions, or some combination of the foregoing." SEC Release, 52 Fed. Reg. at 38403. We find this persuasive, as have our sister Circuits. *See Elliott*, 62 F.3d at 1311 n.8; *see also Thomas*, 631 F.3d at 1164 (citing *Elliott*, 62 F.3d at 1311 n.8). It is not necessary that an investor "pay a discrete fee specifically earmarked as payment for investment advice." *Elliott*, 62 F.3d at 1311; *accord Abrahamson v. Fleschner*, 568 F.2d 862, 870 (2d Cir. 1977) (holding that "compensation" includes salary and a percentage of net profits and capital gains), *overruled in part on other grounds by Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979).

Miller provided securities advice to Carr Miller investors "for compensation." Based upon Miller's securities advice, investors bought Carr Miller promissory notes. The principal they provided became Miller's compensation—his "economic benefit"— when he commingled investors' accounts and spent the money for his own purposes. SEC Release, 52 Fed. Reg. at 38403; *see also Elliott*, 62 F.3d at 1311 (holding that a defendant compensated himself by spending investors' funds for his own expenses). Indeed, Miller siphoned money from Carr Miller investors' accounts like a "credit card" for luxury cars, home furnishings, electronics and vacations. App. 293.

**3**

Miller also argues that he was not an "investment adviser" because he was not registered as an investment adviser, but rather as an investment adviser representative.

13

This argument fails.  Registration is not necessary to be an "investment adviser" under the Act.  *Koch v. SEC*, 793 F.3d 147, 157 (D.C. Cir. 2015); *see also, e.g.*, 15 U.S.C. § 80b-3(b) (providing that certain investment advisers need not register).  Under the Act some rules apply to registered investment advisers, some to unregistered investment advisers and some to both.  *Teicher v. SEC*, 177 F.3d 1016, 1018 (D.C. Cir. 1999).  For example, the Act prohibits fraud by "any" investment adviser, regardless of registration. 15 U.S.C. § 80b-6.  Miller was an "investment adviser" under the Act, despite his failure to register as such, and the District Court properly applied the investment adviser enhancement.

### III

In his next claim, Miller asserts that the Government breached the parties' plea agreement.  Specifically, Miller contends that the Government promised in its 5K1.1 motion to recommend offense level 23, but breached this promise during the sentencing hearing.  At sentencing, the Government repeatedly requested offense level 23, but wavered slightly from this position by stating that a downward departure to offense level 26 would be reasonable.  We hold that Miller failed to preserve his claim and, therefore, plain error review applies.  As to the merits, we assume for the sake of argument that the Government was bound to request offense level 23 and we hold that there was no clear or obvious breach of the plea agreement.

### A

Whether the Government has violated the terms of a plea agreement is a question of law, subject to plenary review.  *United States v. Badaracco*, 954 F.2d 928, 939 (3d Cir.

14

1992).  However, where a defendant fails to object in the district court, we review for plain error.  Fed. R. Crim. P. 52(b); *Puckett v. United States*, 556 U.S. 129, 133-34 (2009).  Under plain error review, we may correct an error only if the appellant establishes (1) an error; (2) that is clear or obvious; (3) affected substantial rights and (4) "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  *United States v. Marcus*, 560 U.S. 258, 262 (2010) (alteration in original) (quoting *Puckett*, 556 U.S. at 135).

**B**

"A party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection."  Fed. R. Crim. P. 51(b).  We use a "flexible, common-sense interpretation" of Rule 51. *United States v. Russell*, 134 F.3d 171, 178 n.4 (3d Cir. 1998).  While a party must present the issue "squarely" to the district court, we do not require any particular incantation.  *United States v. McCulligan*, 256 F.3d 97, 101 (3d Cir. 2001).  This rule affords the district court, which "is ordinarily in the best position to determine the relevant facts and adjudicate the dispute," the opportunity to "consider and resolve" the issue.  *Puckett*, 556 U.S. at 134.

Miller's claim on appeal is that the Government breached its promise to recommend offense level 23, which the Government requested in its 5K1.1 motion. Miller asserts that he preserved this claim during the sentencing hearing.  Even applying our "flexible" interpretation, we hold that he did not.  *Russell*, 134 F.3d at 178 n.4.

15

Miller's counsel stated at sentencing that the District Court's downward departure from level 30 to 27 would be "in contradiction to the plea agreement." App. 274. This statement failed to present the District Court with the specific claim raised on appeal. Although we do not require a lawyer to use any special language, Miller did not state that the Government was bound by the 5K1.1 motion or that the Government was obligated to request level 23; nor did Miller convey the meaning of his claim on appeal in any other way. Thus, plain error review applies.[9]

## C

We now turn to the merits of Miller's breach of plea agreement claim. We hold that there was no clear or obvious error.

When a guilty plea "rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). "Strict compliance with the terms of a plea agreement is not only vital to the efficient function of our criminal justice system, but also required to preserve the integrity of our constitutional rights." *United States v. Larkin*, 629 F.3d 177, 186 (3d Cir. 2010) (citing *Santobello*, 404 U.S. at 262-63). We analyze plea agreements under contract law standards. *United States v. Nolan-Cooper*, 155 F.3d 221, 236 (3d Cir. 1998). The Court

---

[9] Although it is not a basis for our ruling, we note that the District Court did not understand the purported objection as Miller does. Rather, the District Court seemed to believe that Miller was seeking a departure to level *26*. This is evident from the District Court's response. In response to Miller's purported objection, the District Court urged the Government to request an additional one-level downward departure to level 26; the District Court did not mention level 23.

determines whether the Government's conduct is inconsistent with what the defendant reasonably understood. *United States v. Davenport*, 775 F.3d 605, 609 (3d Cir. 2015); *Nolan-Cooper*, 155 F.3d at 239. We give the benefit of the doubt to the defendant in light of the Government's bargaining power and the fact that the defendant waives his constitutional rights. *Nolan-Cooper*, 155 F.3d at 236.

When considering an alleged breach of a plea agreement, we first identify the terms of the agreement. We then determine whether there has been a breach. If so, we fashion a remedy. *Id.* at 235.

In Miller's case, the Government filed a written 5K1.1 motion, which requested a downward departure of "'3 levels from the parties' stipulated offense level of 26,' to 'offense level 23.'" Br. for Appellee 27 (quoting App. 360). Miller asserts that he reasonably understood this to be a term of the plea agreement and, therefore, that the Government was bound to recommend offense level 23 at sentencing. *Cf. United States v. Baird*, 218 F.3d 221, 230 (3d Cir. 2000) (holding that the Government was bound by an agreement it treated as binding, although it preceded the formal plea agreement). We will assume for the sake of argument that the Government was bound to request a downward departure to level 23.[10]

---

[10] Miller's case is distinguishable from *United States v. Medford*, in which we held that the Government was bound to file a 5K1.1 motion but was free to "not recommend departure" at sentencing. 194 F.3d 419, 423 (3d Cir. 1999). In *Medford*, we emphasized that the district court was not permitted to depart below the Guideline range without a motion by the Government. *Id.* The plea agreement in *Medford* related directly to this requirement—the Government promised to "'mak[e] a motion *to allow* the Court to depart.'" *Id.* (alteration in original and citation omitted). In contrast, Miller's cooperation agreement provided that the Government "will move the sentencing

Yet even assuming that the Government was bound to request offense level 23, there was no clear or obvious breach. To the contrary, the Government's comments at sentencing were consistent with its 5K1.1 motion. The Government requested "an offense level 23," stated that a sentence at offense level 26 would be "before the three level downward departure" and stated that its recommendation "would be a 23." App. 273-74. The Government wavered only slightly from this firm position, and did so in response to pressure from the District Court. Specifically, the District Court urged the Government to request a downward departure of one additional level, from level 27 to level 26. In this context, the Government agreed that a sentence at level 26 would be reasonable. We consider this statement "against the entire factual backdrop of the proceedings in front of the District Court." *Larkin*, 629 F.3d at 191. In light of the Government's repeated requests for "an offense level 23," "a 23" and a "three level downward departure" from offense level 26, there was no clear or obvious breach of the agreement. App. 273-74.

**IV**

Finally, Miller objects to his sentence as substantively unreasonable. The District Court imposed a Guideline sentence of 120 months' imprisonment. We reject Miller's challenge to this sentence.

Our standard of review is abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). We review the totality of the circumstances, and the party challenging the

judge . . . to depart" and the Government's 5K1.1 motion specifically requested a downward departure of "'3 levels from the parties' stipulated offense level of 26,' to 'offense level 23.'" Br. for Appellee 33 (quoting App. 346); *id.* at 27 (quoting App. 360).

sentence bears the burden of proving unreasonableness. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc). "[T]he touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *Id.* at 568 (citation omitted). A district court must "make an individualized assessment based on the facts presented" and provide "an explanation sufficient for us to see that the particular circumstances of the case have been given meaningful consideration within the parameters of § 3553(a)." *Id.* at 567 (quotation marks and citations omitted).

There was no abuse of discretion in Miller's case. The District Court considered all of the Section 3553(a) factors, including the fact that Miller engaged in a "pernicious and predatory" fraud on over 190 investors who entrusted him with $41.2 million. App. 289. The District Court also considered Miller's personal characteristics, including his convictions for driving while intoxicated, his deceitful "public persona of a very successful entrepreneur" and his "lavish lifestyle using the investors' money, which [Miller] said was like using [his] own credit card." App. 293. As to Miller's health, the District Court accounted for the fact that Miller's medical condition would make his incarceration more difficult. Indeed, the District Court stated that it would have varied upward more but for Miller's health. Thus, the sentence was not substantively unreasonable.[11]

---

[11] Miller also contends that because the implants in his abdomen will eventually require replacement, there can be *no* constitutionally acceptable treatment while he is imprisoned, and, thus, his incarceration violates the Eighth Amendment deliberate indifference standard. This argument fails. *Cf. United States v. Kidder*, 869 F.2d 1328,

## V

The judgment of the District Court is affirmed.

---

1331 n.4 (9th Cir. 1989) (rejecting a defendant's claim that it violated the Eighth Amendment to sentence him to prison); *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (noting that a "mere disagreement as to the proper medical treatment" does not support a claim of an Eighth Amendment violation).