**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1327
_____

UNITED STATES OF AMERICA

v.

LUIS DAVIS,
            Appellant
_____

On Appeal from the District Court
of the Virgin Islands
(D.C. No. 1-17-cr-00038-001)
District Judge: Honorable Wilma A. Lewis
_____

Argued on December 13, 2023

Before: HARDIMAN, KRAUSE, and RENDELL, *Circuit
Judges*.

(Filed: June 27, 2024)

Matthew A. Campbell [Argued]
Office of Federal Public Defender
District of the Virgin Islands

1336 Beltjen Road
Suite 202, Tunick Building
St. Thomas, VI 00802

     *Counsel for Appellant*

Daniel H. Huston
Office of United States Attorney
1108 King Street, Suite 201
Christiansted, VI 00820

Delia L. Smith
Adam Sleeper [Argued]
Office of United States Attorney
5500 Veterans Drive
United States Courthouse, Suite 260
St. Thomas, VI 00802

     *Counsel for Appellee*

_____

OPINION OF THE COURT
_____


HARDIMAN, *Circuit Judge*.

Luis Davis appeals the District Court's judgment sentencing him to 102 months' imprisonment. He claims the Government breached its promise in a plea agreement to recommend a sentence at the "low end" of his Sentencing Guidelines range (87 to 108 months). We agree that the Government breached the agreement when it emphasized the heinous nature of Davis's crimes and the harm suffered by the

victims. In doing so, the Government effectively advocated for a sentence higher than the one it promised to recommend. So we will vacate and remand for resentencing.

I

Stephen O'Dea and Kathryn Duncan were asleep at home on the island of Saint Croix in September 2017 when they awoke to three intruders: Luis Davis, Joel Rivera, and Chriss Cepeda. The masked men were no strangers to the property—at least one of them had helped O'Dea prepare the estate for a hurricane several weeks prior. The trio punched O'Dea in the face and ripped the bedsheets off Duncan. They also slapped Duncan, threatened to rape her, and put a gun to her head—telling her it "would be blown off" if she didn't tell them where to find the couple's money. App. 100. After O'Dea revealed that his wallet was at a nearby farm, the culprits forced the couple into O'Dea's truck at gunpoint. While continuing to punch O'Dea and menace Duncan, they drove to the farm where they seized O'Dea's wallet and cash. They then forced the victims to their knees and stripped them naked before driving off in O'Dea's jeep. Stranded, the couple ran to a neighbor's house for help.

Police tracked the perpetrators to a gas station, where they recovered Duncan's stolen iPad along with two loaded handguns and ammunition stashed in a backpack. A grand jury later indicted Davis on twelve counts, charging him with violations of Virgin Islands and federal law.

Davis signed a written agreement pleading guilty to three counts: brandishing a firearm during a violent crime in violation of 18 U.S.C. §§ 2(a) and 924(c)(1)(A)(ii), carjacking in violation of 18 U.S.C. §§ 2(a) and 2119(1), and being a felon

3

in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). In exchange, the Government agreed to dismiss the remaining counts and to recommend the seven-year statutory minimum sentence for brandishing the firearm. Central to this appeal, the Government also agreed to recommend "a sentence at the low end of the applicable guideline range," as "determined by the Court," for the grouped carjacking and felon-in-possession counts. App. 83. The parties calculated that range as 87 to 108 months' imprisonment.

Consistent with the plea agreement, the parties' sentencing memoranda recommended a sentence at the low end of Davis's Guidelines range, with the Government specifically recommending 87 months and Davis offering mitigating evidence to support the recommendation. At sentencing, the Court determined the applicable Guidelines sentence for brandishing a firearm was the statutory minimum of 84 months' imprisonment and the Guidelines range for the carjacking and felon-in-possession counts was 87 to 108 months' imprisonment, to be served consecutive to the brandishing offense.

Davis's counsel presented mitigating evidence regarding his client's abusive childhood, intellectual disabilities, drug addiction, the negative influence of his adopted brother, and the lack of helpful interventions throughout his life. Counsel also presented a neuropsychologist's report claiming that childhood head trauma had impacted Davis's cognitive development and executive function.

For its part, the Government recounted in detail Davis's crime and his cruelty toward O'Dea and Duncan. The

4

prosecutor described how the perpetrators broke into the victims' bedroom in the middle of the night, menaced them at gunpoint, and stranded them naked at the shoreline—all while physically assaulting the couple and threatening to kill them. He also emphasized Davis's unwavering commitment to his crime: "[E]ven with [Davis's] impulse control limitations, he had ample time, ample opportunity, ample segments where [h]e could have tapped out," but he chose not to do so. App. 145. The Government also discussed the ongoing emotional trauma Davis "inflicted on" the couple: Davis caused Duncan to suffer "frustration," "hostility," "anger," and "bitterness," and to abandon her plans to retire in Saint Croix because she "no longer felt safe" there. App. 147–50. Finally, the Government blamed Davis for the couple's breakup, claiming that Davis's crime "generated [a] conflict" and "underlying tension" such that "[t]hey are no longer together." App. 149.

The prosecutor explained that the victims were "traumatized" and "did not want to go through it again" by testifying at trial. App. 151. Resolving the case through a plea agreement, he added, avoided further emotional impact for the couple—who feared "they might be . . . target[ed]" by individuals associated with the defendants if they testified against Davis. App. 153. Davis's counsel then interjected: "[I]t's sounding close to a breach . . . I'm not hearing the government recommend the sentence which we agreed upon and . . . expressing the position that . . . the sentence . . . is sufficient and not greater than necessary." App. 153–54. The Government responded that it was "not deviating from the Plea Agreement or the recommendation[]" but was simply offering a balanced picture of Davis's offense and the "perspectives from the victims." App. 154–55.

Later, the Court asked the Government to respond to Davis's mitigating evidence, including the neuropsychological report's assertion that childhood head trauma had affected Davis's impulse control. The prosecutor answered that he was "skeptical" of such reports and found them "self-serving." App. 160. He also noted that because the report was unavailable when the parties executed the plea agreement, it was not "part or parcel of the [Government's] recommendation." App. 162. While Davis's psychological evidence "might be mitigating" and "probably support[ed]" a low-end sentence, the Government insisted that it "d[idn't] explain away [Davis's] conduct." App. 161–62. Again, Davis's counsel objected, claiming that the Government's position "sound[ed] ... like" a breach of the plea agreement. App. 162.

This exchange prompted the Court to seek clarification: "You are both . . . recommend[ing] . . . the same sentence. . . . That does not mean that you have to come to that conclusion because of the same reasons, right?" App. 162–63. Davis's counsel agreed, but added: "[F]or the government . . . to be challenging whether my conclusion is correct, . . . by attacking the basis for it, . . . sounds like a breach." App. 163. The Government responded that it couldn't have relied on Davis's neuropsychological report because it "didn't have that information at the time . . . [the] recommendation" was included in the plea agreement. *Id.* Davis countered that the Government's dismissive posture toward the mitigation evidence undermined the parties' recommendation. The Government reiterated that it was "not challenging" the defense's neuropsychological report, "just not adopting it to support [the Government's] position." App. 164. When the Court asked Davis's counsel to respond to the prosecutor's explanation, she receded: "I[] think saying [']I'm not

6

challenging it['] is a much better, firmer place to be than what I was receiving. So I think that the government saying they're not challenging our expert report, I'm comfortable with that." *Id.*

On top of the statutory minimum of 84 months' imprisonment for brandishing a firearm, the District Court sentenced Davis to 102 months' imprisonment on the carjacking and felon-in-possession counts. As the Government acknowledges, this is a sentence at the "mid-to-high" end of the Guidelines range. Govt. Br. 8. Davis appealed.

II[1]

Davis contends the Government breached its promise to recommend a low-end Guidelines sentence by emphasizing "aggravating victim-impact evidence," "the heinous nature of the crimes, and . . . the permanent damage done to the victims." Davis Br. 14–15, 22. He further argues the Government breached by "discount[ing] any value" of his mitigation evidence and failing to "meaningfully argue . . . that the sentence was appropriate based on the" 18 U.S.C. § 3553(a) sentencing factors. Davis Br. 18, 19. As a result, Davis argues, the Government's allocution reads like a recommendation for a sentence at or above the top of the Guidelines.

Before we consider the substance of those contentions, we must determine the appropriate standard of review. The Government argues that Davis waived objection to the Government's allocution when his counsel "indicated that her

---

[1] The District Court had jurisdiction under 48 U.S.C. § 1612 and 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

7

concerns had been resolved." Govt. Br. 33. The Government alternatively argues that Davis forfeited his breach claim by failing to object clearly at sentencing.

"Waiver is the intentional relinquishment or abandonment of a known right," while "forfeiture is the failure to make the timely assertion of a right." *United States v. Dowdell*, 70 F.4th 134, 140 (3d Cir. 2023) (cleaned up). Although we cannot reach waived arguments, we may review a forfeited claim—but only for plain error. *See United States v. Dahmen*, 675 F.3d 244, 247–48 (3d Cir. 2012) (citing *Puckett v. United States*, 556 U.S. 129, 133, 143 (2009)). To determine whether Davis's breach claim has been waived or forfeited, we must first identify Davis's arguments. He contends the Government breached by: (1) emphasizing the heinous nature of his crimes and the victim impact; (2) dismissing his mitigation evidence; and (3) failing to argue that the § 3553(a) factors supported a low-end Guidelines sentence.

The Government argues that Davis waived his breach arguments by "taking the position" at sentencing "that any breach could be, and in fact was, cured." Govt. Br. 35. Davis concedes that he waived objection to one of the prosecutor's statements when his counsel stated she was "comfortable" with the Government's position of "not challenging" Davis's neuropsychological report. App. 164. In stating that she accepted the Government's position on the report, Davis's counsel waived objection to all the prosecutor's statements about the defense's mitigating evidence. Indeed, Davis's counsel acknowledged at oral argument that the waiver extended more broadly to the Government's remarks regarding

the defense's neuropsychological report.[2] All the Government's allegedly breaching statements regarding Davis's mitigating evidence concern this report—so all three of Davis's objections raised during that part of the Government's allocution "depend on the same facts" and are waived. *United States v. Joseph*, 730 F.3d 336, 342 (3d Cir. 2013).

But that waiver did not negate Davis's earlier objection to the Government's comments emphasizing Davis's reprehensible conduct and the harm he inflicted on the victims. We are loath to deem an objection waived without a clear indication of a party's intent to do so. *See MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 215 (3d Cir. 2005). Waiving one argument waives another only if they both "depend on the same legal rule" and "the same facts." *Joseph*, 730 F.3d at 342. Because Davis's earlier objection depended on different facts than those underlying his withdrawn objection, it was not waived. So the cases cited by the Government supporting its waiver argument are inapt, as they involved explicit withdrawals of prior objections. Unlike those cases, Davis never expressly withdrew his first objection to the Government's comments about his conduct, character, and the victim impact.

The Government contends that, even if Davis did not waive all his objections, he forfeited them by failing to clearly

---

[2]     The Court: So [the withdrawn objection] relates to the [Government's] challenge to the expert report?

    Counsel: . . . Yes . . . .

Oral Arg. 10:43–11:01.

9

argue that the prosecutor's allocution violated the plea agreement. It notes that Davis's counsel accused the prosecutor only of coming "*close* to a breach." Govt. Br. 32.[3] In determining whether a claim of error has been preserved, we use "a flexible, common-sense interpretation." *United States v. Miller*, 833 F.3d 274, 283 (3d Cir. 2016) (citation omitted). And although "a party must present the issue squarely to the district court, we do not require any particular incantation." *Id.* (cleaned up). After the prosecutor recounted Davis's intentional crimes, the physical and emotional harm suffered by the victims, and the Government's desire to avoid re-traumatizing the couple, Davis's counsel interjected. She asserted that the prosecutor was neither "recommend[ing] the sentence" the parties "agreed upon" nor "expressing the position that . . . the sentence . . . is sufficient and not greater than necessary." App. 153–54. This objection closely followed the Government's allegedly offending statements, used the word "breach," and explained why the prosecutor's comments undermined the agreement. So Davis preserved his arguments alleging the Government breached by (1) criticizing Davis's conduct and character; (2) emphasizing the victim impact; and (3) failing to tether its recommendation to the § 3553(a)

---

[3] The Government emphasizes that Davis "did not object to the Government's sentencing memorandum" despite its references to Davis's crimes and victim impact. Govt. Br. 31. But failing to object to a pre-sentencing memorandum does not forfeit later objections to the Government's conduct at sentencing. *Cf. United States v. Yusuf*, 993 F.3d 167, 178 n.7 (3d Cir. 2021) (the government's plea breach argument was preserved, despite failing to object to the defendant's presentence filings, because the prosecutor objected at sentencing).

factors. We review these arguments de novo. *See United States v. Yusuf*, 993 F.3d 167, 175 n.5 (3d Cir. 2021).

III

Turning to the merits of Davis's breach claim, we first note that there was no express breach of the plea agreement. The Government neither explicitly disavowed the "low end" recommendation nor requested a sentence at the mid-to-high end of the Guidelines range. But *Santobello v. New York*, 404 U.S. 257 (1971), "and its progeny proscribe not only explicit repudiation of the government's assurances, but . . . [also] forbid end-runs around them." *United States v. Badaracco*, 954 F.2d 928, 941 (3d Cir. 1992) (citation omitted). So the Government breaches a plea agreement when its overall conduct is "inconsistent with what was reasonably understood by the defendant when entering" a guilty plea. *United States v. Nolan-Cooper*, 155 F.3d 221, 236 (3d Cir. 1998) (citation omitted).

We derive this rule from the "contract-law standards" governing plea agreements. *United States v. Moscahlaidis*, 868 F.2d 1357, 1361 (3d Cir. 1989). Those standards "emphasize[] faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 cmt. a (1981). And because a defendant surrenders several constitutional rights by entering into a plea agreement, courts must "scrutinize closely the promise[s] made by the government" to determine whether those promises have been fulfilled. *Nolan-Cooper*, 155 F.3d at 236 (citation omitted). In sum, the Government must honor the spirit, as well as the letter, of the plea agreement. *See Badaracco*, 954 F.2d at 940.

A

Under our precedents, the Government violated the plea agreement by repeatedly underscoring the reprehensibility of Davis's conduct. In *Moscahlaidis*, we held that the Government breached a promise "to take no position as to whether a custodial sentence should be imposed" where the prosecutor "offered opinions and drew conclusions about [the defendant's] character." 868 F.2d at 1363. The prosecutor emphasized that the defendant was "not just a white-collar criminal" and highlighted "the depth of [his] greed[,] . . . moral bankruptcy," and "utter contempt for the welfare of his fellow man." *Id.* at 1362. Those comments, we held, were "a transparent effort to influence the severity of [the defendant's] sentence" in violation of the plea agreement. *Id.* (cleaned up).

Similarly, in *United States v. Nolan-Cooper*, we held that the Government breached its promise to recommend a sentence within Nolan-Cooper's 41 to 51 months Guidelines range. But at sentencing the district court calculated the range at 63 to 78 months' imprisonment. Then, during allocution, the Government called the defendant's conduct "*knowing[]* and *deliberate[]*," "egregious," and "callous and calculating attempts to subvert the law." 155 F.3d at 238 (emphasis added). It also stressed that Nolan-Cooper "was not forced . . . by economics or . . . duress, to commit [her] crimes." *Id.* Though the Government recommended a sentence "within the plea agreement," we held that its statements regarding Nolan-Cooper's conduct and character "c[ould] only be interpreted as an attempt to influence the court to impose a longer sentence than stipulated to in the agreement." *Id.* at 239–40.

Taken together, *Moscahlaidis* and *Nolan-Cooper* establish that, when the Government highlights the

12

reprehensibility of the defendant's conduct or extensively criticizes his character, culpability, or blameworthiness, it essentially recommends a higher sentence. Here, though the Government agreed to recommend a sentence at the low end of Davis's Guidelines range, it repeatedly emphasized Davis's unrepentant intentionality:

> [E]ven with the defendant's impulse control limitations, he had ample time . . . where [h]e could have tapped out . . . and he did not. . . . [Davis] . . . didn't have to leave [the victims] naked fending for themselves with that victimization and embarrassment. . . . [W]e have a conscious thought process, well beyond any impulse issue. And he disregarded what was right; he disregarded what he was inflicting upon those victims, and he chose to continue that course of conduct and that behavior and that violent offense[.]

App. 145–46. As in *Nolan-Cooper*, the Government emphasized Davis's deliberate intent while also dismissing potential contributing factors. And the prosecutor's description of Nolan-Cooper's conduct as "callous and calculating" resembles the Government's remark that Davis "disregarded what was right; [and] disregarded what he was inflicting upon th[e] victims." App. 146. In *Nolan-Cooper*, the prosecutor emphasized that the defendant's money laundering scheme was "particular[ly] egregious" because she was an attorney. 155 F.3d 238 (citation omitted). Likewise, the Government here stressed that Davis and his codefendants exploited a position of trust—as Davis's codefendant had previously worked for O'Dea and recruited Davis to commit the robbery after learning that "the[] [victims] ha[d] money." App. 147.

13

Simply put, the Government's statements supported a higher sentence by accentuating the reprehensible nature of Davis's conduct.

Davis also claims the prosecutor breached the plea agreement by "concentrat[ing]" its allocution "on aggravating victim-impact evidence." Davis Br. 14–15. We have never held that victim-impact evidence undermines a low-end Guidelines recommendation per se. But we have held that the Government breaches an agreement to make no sentencing recommendation, or to recommend a within-Guidelines sentence, by using victim-impact evidence to implicitly support a higher sentence. For instance, in *United States v. Hodge*, we held that the prosecutor breached an agreement "to make no specific sentencing recommendation other than to request that the sentence be within the guideline range" by stating that Hodge's victims "did not get a second chance to be a positive influence in the community" and "urg[ing] the Court to fashion a sentence that is fair and just to the victims." 412 F.3d 479, 487 (3d Cir. 2005) (quotations omitted). The "plain implication" of those statements, we reasoned, was the Government's preference for a life sentence. *Id.*

Some of our sister courts have held that the Government breaches an agreement to recommend a low-end Guidelines sentence where, as here, the prosecutor recounts the defendant's crime while emphasizing the harm suffered by the victims. For instance, in *United States v. Gonczy*, the prosecutor noted that Gonczy had defrauded "innocent victims" and "ruined many lives," including "the lives of his own children," through an illegal telemarketing scheme. 357 F.3d 50, 53 (1st Cir. 2004). The court held that these statements breached the Government's promise to recommend a low-end Guidelines sentence. *Id.* Though the prosecutor "stopped short

14

of explicitly repudiating the agreement," the court concluded that the Government's allocution "undercut, if not eviscerated" the parties' sentencing recommendation because "no fair reading of [the prosecutor's] argument . . . would lead an impartial observer to think that [she] thought [the low end] was an adequate sentence." *Id.* at 54 (cleaned up).

The reasoning of *Hodge* and *Gonczy* supports Davis's breach claim. The Government devoted much of its allocution to the physical and emotional trauma inflicted on Duncan and O'Dea. The prosecutor said that he wanted to give the Court the "perspectives from the victims." App. 155. *Cf. Hodge*, 412 F.3d at 487 (urging the Court to be "fair and just to the victims" in sentencing). And so he did, recounting the victims' harrowing ordeal in great detail, including the assaults, threats, and humiliation; the demise of the couple's relationship; the lingering feelings of anger, fear, and resentment; and the loss of security.

> [Duncan] and . . . O'Dea wake up to guns, punches, threats, and are assaulted in the middle of the night . . . . [T]hey are victimized verbally, physically, [and] traumatized with . . . threats, ["]I'll kill you.["] And Ms. Duncan makes a reference that one of them threatened to rape her.

App. 147. Statements like these are typically fair game in most sentencing hearings. But where, as here, the Government has agreed to recommend a sentence at the low end of the Guidelines range, its allocution must align with that recommendation. The Government's vivid recapitulation of Davis's crime and the victims' plight supported a harsh, not a lenient, sentence. *See United States v. Johnson*, 187 F.3d 1129, 1135 & n.6 (9th Cir. 1999) (the Government's victim impact

statements, coupled with its unenthusiastic support for a low-end sentence, breached the plea agreement).

For the foregoing reasons, we conclude that the prosecutor's allocution was inconsistent with Davis's reasonable expectations in entering the plea agreement. The Government's comments highlighting Davis's intent, the reprehensible nature of his crime, and the harm suffered by the victims "could [not] possibly be construed as advocating for the lower half of the [Guidelines] range." *Nolan-Cooper*, 155 F.3d at 240. Accordingly, we hold that the Government breached the plea agreement.[4]

B

The Government responds that, while some of its comments "approached the line," its allocution was consistent with the plea agreement. Govt. Br. 43. It argues that the prosecutor's discussion of "aggravating factors" at sentencing was appropriate because: (1) the plea agreement did not forbid it; (2) the Court expected to hear "a more nuanced recommendation" after Davis's allocution; and (3) doing so was necessary to dissuade the Court from applying a downward variance. Govt. Br. 39–40. It also argues that (4) the prosecutor technically complied with the agreement by "repeatedly stat[ing]" in response to Davis's objections "that he stood by the plea agreement and was not seeking to breach or undermine it." Govt. Br. 43. These arguments are

---

[4] Having concluded that the prosecutor breached the agreement by emphasizing the brutal nature of Davis's crimes and the harm inflicted on the victims, we need not consider Davis's argument that the Government failed to tether its recommendation to the 18 U.S.C. § 3553(a) factors.

unpersuasive.

The absence of language in the plea agreement prohibiting the Government from discussing Davis's criminal conduct and the victim impact does not absolve its breach. In *Nolan-Cooper*, we held that the Government could not "rely on a general provision of the plea agreement permitting it to comment on the facts of the case *to defeat the purpose* of a specific provision." *Nolan-Cooper*, 155 F.3d at 237 (emphasis added). Unlike the broad provisions invoked by the Government in *Nolan-Cooper*, Davis's plea agreement says nothing about the scope of the Government's right to discuss Davis's conduct, let alone any aggravating factors. Instead of affording the Government latitude, the agreement here puts the Government on even weaker footing.

Nor can the Government defend its allocution by calling it a "nuanced" presentation meant to address anticipated questions from the Court. We rejected a similar argument in *Nolan-Cooper*, where the Government claimed its statements were made "in response to a question by the court." *Id.* at 238. We stressed that the Government must uphold its promise even though the court's inquiries "may place the government in an uncomfortable situation, [and] it still must inform the court that it cannot answer the question without breaching its plea agreement. Sometimes 'the better part of valor is discretion.'" *Id.* (citations omitted).

Here again, the Government's allocution is less defensible than the prosecutor's in *Nolan-Cooper*. The Government claims its comments regarding Davis's crimes

17

and the victim impact were directed at *anticipated* questions.[5] Had the Court asked those questions, the Government was obliged to respond that the plea agreement forbade further comment. *Cf. United States v. Crusco*, 536 F.2d 21, 26 (3d Cir. 1976) ("An unqualified promise of the prosecution . . . obviously jeopardizes the Government's position in . . . sentencing[,] [yet] may require the Government to remain silent when it should stand up and speak."). Alternatively, the Government could have referred the Court to the record or, if it could do so without undermining the agreement, offered a measured response—providing only the information necessary to address the Court's inquiries. *See United States v. Warren*, 8 F.4th 444, 448 (6th Cir. 2021) ("[A] line exists between advocacy, on one hand, and providing the district court with relevant factual information, on the other hand.") (cleaned up). Instead, the Government underscored the victim's suffering and Davis's unflagging commitment to the crime. And it did so without offering any convincing support for the low-end Guidelines sentence it had promised to recommend.

The Government also contends that its comments were intended not to undermine the low-end recommendation but to discourage the Court from applying a downward variance. Where a "plea agreement contain[s] no language prohibiting the government from defending against a . . . variance" request, the Government can present aggravating evidence to "defen[d]

---

[5] The Court's indication that it "expect[ed]" to hear about "the victims" and the other "side to this equation" came *after* Davis's attorney objected to the Government's detailed recitation of Davis's crime and the harm suffered by the victims. App. 155.

against" such a request without violating "the spirit of the agreement." *United States v. Yanez-Rodriguez*, 555 F.3d 931, 941 (10th Cir. 2009). But Davis never requested a variance and the District Court never intimated that it was considering one. So this argument is a nonstarter. *Cf. Gonczy*, 357 F.3d at 54 (rejecting the "argument that the prosecutor['s]" discussion of victim impact "merely anticipat[ed] the [defendant's] request for a downward departure").

Finally, we are not swayed by the Government's argument that it fulfilled its promise, despite highlighting Davis's culpability and the victim impact, by "expressly and repeatedly request[ing] a sentence at the bottom of the . . . guideline range." Govt. Br. 43. We reject "such a strict and narrow interpretation of [the Government's] commitment." *Crusco*, 536 F.2d at 26. The Government must do more than recite the magic words that it "recommends" a low-end sentence—it must also avoid statements that undermine the recommendation. *See Badaracco*, 954 F.2d at 939. In other words, "the government . . . may not introduce its agreed-upon terms with a wink and a nod." *Lacombe v. Warden James T. Vaughn Corr. Ctr.*, 95 F.4th 127, 135 n.11 (3d Cir. 2024). Because that is precisely what happened here, we hold that the Government breached the plea agreement.

IV

Having concluded that the Government breached the plea agreement, we turn to whether the Government cured its breach.[6] Applying the Supreme Court's decision in *United*

---

[6] As noted in our discussion of waiver, Davis's counsel's statement that she was "comfortable" with the Government's position pertained only to the neuropsychological report. That

19

*States v. Puckett*, we recently held that "the prosecution can cure some breaches of plea agreements" and we adopted a two-step test to guide our inquiry. *United States v. Cruz*, 95 F.4th 106, 112 (3d Cir. 2024). "First, we gauge whether cure is needed or even possible. Second, we decide whether the attempted cure sufficed to remedy any harm from the breach." *Id.* An attempted cure is effective only if it is prompt, clear, and gives the defendant the benefit of his bargain. *Id.*

Assuming that the Government could have cured its breach, it did not do so here. If, after addressing Davis's conduct and the victim impact, the prosecutor had pivoted and argued that despite the aggravating factors, other considerations merited a low-end Guidelines sentence, that might have sufficed to cure the breach. Instead, when prompted by Davis's objections, the prosecutor offered only cursory assurances that the Government stood by the recommendation. Indeed, the Government's primary justification for the low-end sentence was that it secured Davis's guilty plea and spared the victims an emotional trial. And while this speaks to the Government's rationale for accepting the agreement, it does not *recommend* a low-end sentence—*i.e.*, it does not explain why the sentence is appropriate for Davis. Because the Government did not promptly and clearly repudiate its breach, we hold that the breach was not cured.[7]

could not be viewed as curing previous objections to the Government's comments emphasizing the heinous nature of Davis's crime.

[7] We need not decide today whether a plea breach to which defense counsel promptly objected is separately subject to harmless error analysis or how the harmless error standard in

## V

When we review the Government's fulfillment of its promises in a plea agreement, we "give the benefit of any doubt to the defendant, given the government's tremendous bargaining power . . . and the fact that the defendant, by entering into the plea, surrenders a number of [his] constitutional rights." *United States v. Davenport*, 775 F.3d 605, 609 (3d Cir. 2015) (cleaned up). And while our inquiry is "fact-specific, the basic rules are clear." *Hodge*, 412 F.3d at 485. Prosecutors are bound by the letter and spirit "of the bargains [they strike] with defendants," *id.* (cleaned up), and "[o]nce [the Government] makes a promise, *Santobello* requires strict adherence," *Crusco*, 536 F.2d at 26.

For the reasons stated, we will vacate Davis's sentence and remand for resentencing. Though "the need for resentencing was caused by the government and is not attributable to any error by the sentencing judge," we will remand to a different district judge for resentencing. *See Nolan-Cooper*, 155 F.3d at 241. In doing so, we leave to the District Court's discretion the imposition of a just sentence.

---

this context would differ from cure because here, as in *Cruz*, "the government has not shown that its breach was harmless" and "the prosecution did not correct its legal error. So under any standard, the prosecution loses." *Cruz*, 95 F.4th at 113.